## COURT OF APPEALS,

### June. 14, 1907.

# THE PEOPLE *v.* CHARLES BONIER.

### (189 N. Y. 108.)

(1). MURDER—SUFFICIENCY OF EVIDENCE.

The evidence upon the trial of a defendant indicted for murder examined and held sufficient to sustain a verdict convicting the defendant of the crime of murder in the first degree.

(2). VENUE—WHEN FACTS INSUFFICIENT TO SUSTAIN MOTION FOR CHANGE OF PLACE OF TRIAL OF A DEFENDANT CHARGED WITH THE CRIME OF MURDER.

Where it appears from the record upon an appeal from an order denying the motion of a defendant, charged with a brutal and atrocious murder, for a change of venue, upon the ground that a fair and impartial trial could not be had in the county where the indictment was found, that only eighty-four talesmen were examined in obtaining a jury and that the defendant interposed only sixteen peremptory challenges, although under the statute he was entitled to thirty, it cannot be held that there was such a violent prejudice against the defendant, that the presumption of innocence to which he was entitled had been converted into a universal presumption of guilt whereby it was impossible to obtain a fair and impartial jury before whom the defendant could be tried.

(3). EVIDENCE—ADMISSION IN EVIDENCE OF HAMMER FOUND NEAR BODIES OF THE VICTIMS OF THE HOMICIDE NOT ERRONEOUS.

It is not reversible error to receive in evidence, upon the trial of such defendant, a hammer found in a shed in which the bodies of the victims were found and in close proximity thereto, where it appears that the heads of the victims had been crushed in by some blunt instrument and the hammer was just such an instrument as might have been used to crush a human skull and, in addition, it was stained with human blood and had attached to it white human hairs, especially where, even if the hammer had not been received in evidence, the proof of the defendant's guilt would still be overwhelming and conclusive.

(4). REBUTTAL—WHEN EVIDENCE TENDING TO CONTRADICT TESTIMONY FAVORABLE TO DEFENDANT IS PROPERLY RECEIVED.

Where there is evidence, upon the trial of such defendant, that the motive for his committing the crime, was his desire to obtain the real property of his victims without having the money to purchase it and by

means of forged deeds purporting to convey the property to him, it is not reversible error to receive evidence that the defendant had permitted his invalid wife to become a patient at the county hospital as a public charge, offered in rebuttal of testimony, introduced by the defendant, tending to show that he had been in possession of means with which he might have purchased the property; even if this evidence were regarded as somewhat remote, that would simply affect its weight and not its competency.

APPEAL from a judgment of the Supreme Court, rendered January 25, 1905, at a Trial Term for the county of Erie upon a verdict convicting the defendant of the crime of murder in the first degree; also appeal from an order of the court at Special Term, entered January 13, 1905, which denied a motion for a change of venue.

The facts, so far as material, are stated in the opinion.

*Philip V. Fennelly* and *Murlin S. Smallwood* for appellant. It was error to receive the hammer in evidence, as there was no testimony connecting the defendant with it. (*People* v. *Hill,* 123 Cal. 571; *State* v. *Tippet,* 63 N. W. Rep. 443; *Rudolf* v. *People,* 45 N. Y. 213; *State* v. *Lett,* 85 Mo. 55.) It was error to receive evidence to establish that the defendant had not the means to pay for the property alleged to have been purchased. (*People ex rel. Moynihan* v. *Greene,* 179 N. Y. 253.) The verdict was against the weight of evidence, and justice requires a new trial. (*O'Brien* v. *People,* 36 N. Y. 276; *People* v. *Kelley,* 113 N. Y. 647; *People* v. *Fish,* 125 N. Y. 136.) The court erred in refusing defendant's motion for a change of venue. (*People* v. *McLaughlin,* 150 N. Y. 365; *People* v. *Diamond,* 36 Misc. Rep. 71; *People* v. *Georger,* 109 App. Div. 111.)

*Frank A. Abbott,* District Attorney, for respondent.

WERNER, J. The annals of crime contain no more revolting story than that which is set forth in the pages of the record at

bar. An aged man and wife, of pure and simple life, who together had trod the paths of industry and peace for more than half a century, were brutally murdered in their own home in the city of Buffalo. The evidence of this atrocious crime was purely circumstantial, and it led to the accusation and indictment of the defendant, who had himself then passed the scriptural milestone of three score and ten. The motive ascribed for the deed was the defendant's desire to obtain the Freher property without having the means to purchase it, and this, it is said, led to the commission of the double homicide and to the forgery of two deeds purporting to have been executed and delivered by Franz Freher to the defendant. Under an indictment found on the 22nd day of December, 1903, charging the defendant with the crime of murder in the first degree for the killing of Franz Freher, the defendant was tried, convicted and sentenced to death. Upon appeal to this court (179 N. Y. 315) the judgment of conviction was reversed for substantial error in the trial judge's charge and a new trial was ordered. A second trial has been had. Again the defendant has been convicted and sentenced, and again he appeals to this court. The present appeal consists of two distinct parts. The first is taken upon exceptions to various rulings made during the course of the trial, upon the ground that no deliberate and premeditated design to effect the death of Franz Freher had been shown, and upon the further ground that the verdict was against the weight of the evidence. The second relates to the denial of defendant's motion for a change of venue, which was urged upon the ground that a fair and impartial trial could not be had in the county of Erie, where the indictment was found.

The appeal from the order denying defendant's motion for a change of venue is supported by a brief so voluminous as to preclude the possibility of specific reference to every phase of the extended argument which it contains. It must suffice, therefore, to say that the argument of defendant's counsel assumes that the

newspaper publications in and about the city of Buffalo had created such a violent prejudice against the defendant that the presumption of innocence to which he was entitled had been converted into a universal presumption of guilt, thus rendering it impossible to obtain a fair and impartial jury before whom the defendant could be tried. This contention is most effectively and conclusively disposed of by the record, which discloses that only eighty-four talesmen were examined in obtaining a jury, and that the defendant interposed only sixteen peremptory challenges, although under the statute he was entitled to thirty. In this generation when the impaneling of a jury in a widely published murder case is the work of weeks and even months; when hundreds of talesmen are usually examined *ad nauseam,* until the public are surfeited with comments upon a trial before it really begins, and when the number of peremptory challenges is only limited by an equally peremptory statute, it requires something more than is disclosed by this compact record to make a case for a change of venue in a criminal case. In view of the fact that only eighty-four talesmen were examined, only sixteen of whom were peremptorily challenged by the defendant, only twelve of whom were peremptorily challenged by the district attorney, forty-four of whom were excused by the court, and twelve of whom were acceptable to all concerned, there is, even in a period prolific of such motions upon the most fanciful grounds, a large element of novelty in the argument that the public sentiment of Erie county was so inflamed as to jeopardize the defendant's constitutional right to a fair trial. If there was any reason to suspect such a condition when the motion was made, it must have subsided with extreme rapidity, for the motion was made on December 29th, 1904, it was decided on January 13th, 1905, the trial was commenced on January 25th, 1905, and a jury was obtained with a facility that needs no vindication. It is true that some of the talesmen who were examined as to their qualifications to sit as jurors betrayed symp-

toms of prejudice against the crime of murder, and particularly a murder so heinous as that referred to in the questions addressed to them; but that, we venture to say, was far from sufficient to disqualify them from serving as jurors. It will be an evil day indeed for the cause of justice when an honest abhorrence of crime shall be regarded as sufficient to exclude an intelligent citizen from the jury box. If that were to become the standard by which to judge of a man's disqualifications for jury duty, murderers and other criminals could never be tried. The true test is whether a man with such a prejudice, which should be the proudest birthright of every citizen, can so far subordinate it to the demands of justice as to render a fair and impartial verdict upon the evidence adduced before him. Measured by that standard there is no reason to suspect that any man who sat in judgment upon the defendant was disqualified.

The appeal upon the merits requires a recital of the gruesome circumstances which are relied upon by the People to sustain the defendant's conviction. We shall state them in outline rather than in detail, for they stand unchallenged, and two juries have certified to their sufficiency to warrant the defendant's conviction.

Franz Freher and Johanna, his wife, aged 82 and 84 years respectively, lived in a little frame house of their own at 339 Jefferson street in the city of Buffalo. They were also the owners of another house known as No. 52 Cherry street in the same city. Franz had been a cabinetmaker by trade, which he had gradually given up with advancing years until, at the time of the homicide, he did nothing beyond the simple errands and odd jobs which were incident to his condition and station in life and were still permitted by the infirmities of age. Johanna was sorely crippled and could scarcely walk, even with the aid of a cane. In the summer of 1903 the defendant began calling upon the Frehers at their Jefferson street home, and it became known in the neighborhood that he was talking of buying it.

At that time the defendant was a widower and was living with a woman named Louisa Lindham, many years his junior, who had left her husband. Under the promise of supporting her and her two children, and of making provision for their future welfare in case of his death, by means of insurance upon his life and otherwise, the defendant had persuaded Mrs. Lindham to become his housekeeper. At the time of the homicide they were living together at 312 Monroe street, which was but a few minutes' walk from the home of the Frehers. As the summer faded into autumn it was observed that the defendant's visits to the Frehers became more frequent until November. During that period he seemed to be in financial straits, for he was unable to pay his modest rent of eight dollars per month, and told his landlady contradictory stories about the sources from which he expected funds wherewith to pay. Thus matters continued until about the 10th or 12th of November, when the defendant was seen at the Cherry street house owned by the Frehers, at a time when Franz and a man named Bundshuh were doing some work about the premises. When the defendant came within hearing distance Franz said, " Here comes that old Mechlenburger, the old swindler, he wants to buy my property, but hasn't got any money to buy it; I wish he would stay away from me." The record does not disclose what, if anything, occurred between the occasion just mentioned and the 19th of November, the day of the homicide. On the latter date the defendant returned to his home much later than was his custom. He had left his house at about one o'clock in the afternoon and, instead of coming back at four or five o'clock as usual, he did not make his appearance until between seven and eight o'clock, when it was after dark. As he came in he seated himself in a chair, when the housekeeper noticed that the tops and soles of his boots were covered with mud. She asked him where he had been, and he replied that he had been digging celery at the Jefferson street house. She asked him if he wished any supper,

but he only took a cup of tea, although usually a very hearty eater, and then retired for the night. On the following morning, Friday, November 20th, Bonier aroused the housekeeper at between five and six o'clock when it was still dark, although he did not usually arise until seven or after, and told her to get him a cup of tea and that he was going over to the Jefferson street house to see the Frehers who were going away. After partaking of a light breakfast the defendant departed and remained away until noon when he returned, unbuttoned his coat, and took from a pocket an envelope. He did not show the housekeeper its contents but said in substance, " See here, I am fixed all right on that Jefferson street place, I have bought it." He also mentioned having purchased the Cherry street place and informed the housekeeper that they were to move the next morning; that he was going to order a van right away. He partook of lunch, and then went out. He returned at two o'clock and remained about the house until four when he complained of a pain in his stomach and laid down for a short time. The housekeeper gave him a cup of tea, which was all the supper he had that day, and he retired early. The next morning, Saturday, November 21st, the van came and moved the defendant's household effects to the Jefferson street house. The evidence now takes us backward a day or two, to Thursday or Friday morning, when the milkman called as usual at the Freher house. He did not see the Frehers, but met the defendant walking back and forth in the yard. The defendant stopped the milkman and told him that the Frehers did not want any more milk; that they had gone to a farm; that he was going to occupy the premises and move in on the following Monday. The milkman thereupon asked the defendant if he did not want to take milk, and the latter said to come on Tuesday and begin the delivery of milk to him. In this connection it appears that it had been the custom of the Frehers to pay their milk bills weekly, usually on Mondays, and that on the morning when the

milkman met the defendant the Frehers were owing for three days' milk. This, with other circumstances, is relied upon to fix the date of the homicide. On Saturday morning, after the arrival of the moving van, a woman living next door to the Jefferson street house opened her window and asked the defendant what had become of the Frehers, and he told her they had gone to some "Home" as he understood it. It appears that there were upon the Jefferson street lot two sheds, one of which was at the rear end of the premises, and the other very near the house of the woman just referred to. The defendant spoke to her about tearing down that shed as it interfered with her view, and on that same morning he talked with his housekeeper about having one Moore, who was related to her, help him in tearing it down. On that day, Saturday, November twenty-first, the defendant and his housekeeper lunched together in the Freher house. After luncheon the housekeeper started at housecleaning. While thus engaged she found under a bed a small black handbag, which she handed to the defendant. He opened it, and it was found to contain gold and paper money, a light colored wallet and a bank book. The defendant placed the contents of the bag upon a table and said, in substance, that the old people must have left in a hurry, and that he would take care of it; they might be back in a week. He also added: "God knows where they have gone." Then he spread the money out upon the table and asked the housekeeper to pull down the window shade, so that the neighbors could not look in. He also asked her to place a basket upon the table next to the window as a shield. These things having been done, he proceeded to count the money, and when he had finished he turned to the housekeeper and said: "Nearly five hundred dollars in all." Thereupon he took out a twenty-dollar gold piece and handed it to her, with the remark: "For being so honest, here is a big cent for you." He then drew out his own old wallet, told the housekeeper to throw it away, and put into his pocket the light colored wallet found in

the bag. He also took the bank book saying that he would take it to the bank, but when the housekeeper asked him about it several days later he said " that has been in the stove this good while." On the same day that this money was found, the defendant gave to the housekeeper a plain gold ring, a breast pin, and some other small articles of jewelry, which he said he found in some of the furniture upstairs. These were later identified as having belonged to the Frehers. During the afternoon of that day the housekeeper asked the defendant for ten dollars with which to pay her brother-in-law that sum borrowed from him, and also two dollars to pay a coal bill for which she had been indebted ever since the preceding winter. The defendant gave her the ten dollars to repay the loan; also five dollars for the payment of the coal bill, and told her to use the balance in purchasing clothing for the children. At or about the same time the defendant further suggested that the housekeeper would not have to go out any more to do washing for other people, as she had been in the habit of doing since they had lived together. On Sunday, November 22nd, the defendant changed his clothing, taking off the trousers that he had worn on Thursday, the 19th, and told her to " fire them." She did not comply with his request but hung them up in the house. Later on the same day he again referred to the subject and repeated his direction. They were later given over to the police, their possssion from that time until the trial was satisfactorily accounted for, and at the trial they were shown to be stained with human blood. During that Sunday forenoon the defendant requested the housekeeper to send her daughter to Mr. Moore. The latter came and the defendant asked him to come over next morning to assist in tearing down the shed. On Monday morning, November 23rd, Moore came and, although it rained hard and it was muddy, he and the defendant demolished the shed, the latter taking some of the shorter boards into the other shed at the rear end of the lot, while the longer ones were piled up in the yard. In the

morning a neighbor called to inquire where the Frehers had gone, and in the evening the Heinekes, grandchildren of the Frehers, called upon the same errand, in company with one Louis Rosenow. The Heineke girl asked the defendant if her grandparents were there and he replied, " I don't know where they are, and if I would know I wouldn't tell." Then the defendant laughed, saying " this is all mine," and slammed the door in the faces of the visitors. In the morning of the same day the defendant had visited a scrivener and notary public named Burzynski, and requested him to draw two deeds. The defendant represented that he had sold two pieces of property, one on Jefferson street and the other on Cherry street. Two deeds were drawn from Franz Freher as grantor to Charles Bonier as grantee. The defendant was asked where his wife was and he replied that he was a widower. The notary thereupon showed him where to affix his signature, and he then signed both deeds in the name of " Frank Freher." Being asked about the recording of the deeds the defendant said " let the man that bought the property put them on record." Having paid the notary the defendant departed. The deeds were recorded in the county clerk's office on the same day, although no one was able to identify the defendant as the person who left them for record.

On Tuesday morning, November 24th, when the milkman came to the house in accordance with the directions of the defendant given on the preceding Thursday or Friday, the defendant said to him, " Where did you tell me the Frehers had gone? Did you tell me the Frehers had gone to a farm? " and the boy replied, " Tell you? You told me where they had gone; that they had gone to a farm," and the defendant said no, he had not.

Rumors were now becoming rife in the neighborhood. No one had seen the Frehers depart. None of their relatives or friends had been told that they had intended to go away. No one seemed to know what had happened or what to do. At this juncture someone telephoned to police headquarters and, with-

out going into unnecessary details, there the matter was taken up. A police captain called at the Jefferson street house on Thanksgiving day, November 26th. The defendant, his housekeeper, her children and a Mr. Shuh were there. The captain asked the defendant if he knew anything of the whereabouts of the Frehers. The defendant said he thought they had gone to an "Anstalt," which is the German for "Institution" or "Home." The captain asked him how he knew, and he replied that he had seen them going away in a hack on Friday morning. The captain left and called again on the following day or the day after, this time accompanied by a Mr. Bundschu. The defendant, his housekeeper and her children were again present. The previous conversation was substantially repeated. The captain then asked the defendant if he had any idea where the old people had gone to, and he answered that he thought they had gone to Ohio. When asked if he knew the particular place in Ohio, he said he did not, but when the captain mentioned Ashtabula the defendant said, " Yes, that is the place they went."

The result of the investigation pursued up to that point led to the institution of a " John Doe " proceeding before the police magistrate on Tuesday, December 1st, in which the defendant was subpœnaed as a witness. The authorities not being ready to proceed on that day, the matter was adjourned to the following day. Before the defendant left the court room some conversation was had between the police captain and the police magistrate within hearing distance of the defendant as to the best method of procedure, and it was suggested that some one ought to find the notary who took the acknowledgments of the deeds from Franz Freher and Charles Bonier. The defendant returned home in the afternoon and turned over to his housekeeper a wooden box with a key containing one hundred and eighty-three dollars in paper money and gold. The next morning, Wednesday, December 2nd, the defendant told his housekeeper that he must leave early to get a seat in the court room where he

18

had been directed to appear. He left the house at about eight o'clock and soon thereafter, between eight and nine o'clock, he appeared at the office of the notary who had drawn the deeds for him. The notary having seen the defendant before coming into the room where the latter was waiting, telephoned from another room to police headquarters that " Mr. Freher " was in his office, for at that time he did not know " Freher " was " Bonier." Having delivered the message, the notary walked into the room where the defendant was waiting and said, " Hello, old man, all the city was looking for you, and you are here," and the defendant said, " All right, all right." The notary then said, " Well you just sit a bit here, and I just go and put my coat on, and I come out to you." As the notary was leaving the room the defendant followed him into a private office and admitted that he was not Freher, but Charles Bonier. The notary, beginning to grasp the situation, said, " Now I tell you what you done, you signed a deed Freher, why, you get in trouble." To this the defendant responded. " Yes, yes, I know I get a states prison." Then the defendant told the notary that he was the only man who could help him out; that he would give him $250 if he would say that the defendant had never been in his office, and the notary replied that he would not do that for $5,000. At this point in the conversation a sergeant from the police station arrived, who upon a signal from the notary, remained outside while the conversation was continued. The defendant began to weep, and the notary, feeling sorry for him, advised that he go and find the Freher people and if they would saction his signature to the deeds it would help. After a moment of apparent reflection the defendant replied that he knew where they were; that it was where old people go for life— " in some homestead "—and that he had signed the deeds because he had paid for the property, and the Frehers had left without giving him his deeds. The defendant then left the notary's office and, instead of going to attend the " John Doe " proceed-

ing, where he had been directed to appear at twelve o'clock, he left the city, and was next heard of in Erie, Pa., where he was arrested on the following day. Meanwhile the police had instituted a search of the Jefferson street premises. After examining the house from attic to cellar they began to dig in the yard and finally came to the shed into which the lumber of the demolished shed had been thrown. Removing this lumber they dug down into the earth, and there, scarcely ten inches beneath the surface, they discovered the body of Franz Freher, clothed and face downward. Immediately underneath this body was that of Johanna Freher, also fully clothed. The heads of these hapless victims had been crushed in by means of some blunt instrument wielded with great violence. Near the gruesome grave of this aged couple lay a hammer which, upon subsequent examination, was found to be stained with human blood, and attached to it were two white human hairs. An autopsy, which was later made, disclosed that the stomachs and intestines of the victims were practically empty. This circumstance, taken in connection with the defendant's absence from his home during the afternoon and early evening of Thursday, November 19th, coupled with the defendant's appearance when he returned home, his boots covered with clay of the same character as that in which these two aged unfortunates were buried, was cogent, if not conclusive, evidence that the defendant had consummated this dastardly tragedy during the afternoon of Thursday, November 19th, 1903. Thus there is reasonable certainty as to the time, and not a shadow of a doubt as to the fact, of the killing of Franz Freher and his wife by the hand of the defendant. In view of the irrefragable circumstances thus briefly outlined, which point with unerring certainty to the perpetrator of this unholy deed, and which disclose in all its inhumanity the unmistakable motive for its commission, it would be a travesty on justice to discuss the questions whether the verdict was against the weight of evidence, and whether the evidence so clearly estab-

lishes a willful and premeditated design to effect death, as to support a verdict of murder in the first degree. We, therefore, pass to the exceptions.

It is contended that it was error to receive in evidence the hammer which was found in the shed where the Frehers were buried, and the argument seems to be, that there was nothing to identify it as the instrument which was used in the commission of the murder, nor to show that the defendant had ever seen it. We think that no error was committed in this behalf. The hammer was found in the shed, under the lumber, and in close proximity to the dead bodies. It was just such an instrument as might have been used to crush a human skull; it was stained with human blood, and had attached to it white human hairs. This was enough to render it competent evidence. (*Ruloff* v. *People,* 45 N. Y. 213.) It may be added, moreover, that even if the hammer had never been found, or had not been received in evidence, the proof of defendant's guilt would still be overwhelming and conclusive.

It is urged that it was improper to permit one Goldberg to testify to a conversation with the defendant in September, 1902, about the latter's financial condition, and also that the evidence of the witnesses Mitzel, Chamberlain and Pfeiffer, bearing upon the same subject, was incompetent and prejudicial to the defendant. Goldberg was a physician who had attended the defendant's wife. He had told the defendant that he did not think it was necessary to call any more, as he could do nothing for the wife, since her case was hopeless. The defendant then said if that was the case he did not want him to call anyway, as he had no means to pay the doctor's fees; that he had been in good shape at one time, but that his son had beaten him out of most of his property.

Mitzel was the overseer of the poor of the town of West Seneca in 1902. The defendant came to him with an order from Long, then superintendent of the poor for Erie county. The

defendant wanted his wife taken to the county hospital. Mitzel asked him if he had any money and he replied in the negative. Mitzel said, " If you have got money why I can't take her out," and the defendant again asserted that he had no money. Chamberlain was deputy superintendent of the poor in September, 1902, and he produced the official records to show that Eva Bonier, wife of the defendant, had been admitted to the county hospital as a public charge.

Pfeiffer was the clerk at that institution. He produced official records and personally testified as to the admission to the hospital of the defendant's wife as a public charge. All this evidence was offered and received in rebuttal after the defense had introduced testimony tending to show that the defendant had been possessed of means with which he might have purchased the Freher property. Even if this evidence were regarded as somewhat remote, that would simply affect its weight and not its competency.

Nothing is presented by this record that authorizes us to interfere with the judgment of conviction appealed from, either as matter of law or discretion, and it must, therefore, be affirmed.

CULLEN, Ch. J., O'BRIEN, EDWARD T. BARTLETT, HAIGHT, HISCOCK and CHASE, JJ., concur.

Judgment of conviction affirmed.