THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* THEODORE W. SAMUELS, Appellant.

Argued October 19, 1950; decided January 18, 1951.

*Abraham J. Gellinoff, Herman C. Laster, William J. Calise, Jerome I. Hyman* and *Florence Match* for appellant. I. The admission in evidence of the entire contents of defendant's hospital record at Bellevue and at Matteawan was error on the ground that these records contained prejudicial hearsay. (*People* v. *Kohlmeyer,* 284 N. Y. 366; *People* v. *Hawkins,* 109 N. Y. 408; *England* v. *United States,* 174 F. 2d 466; *Bothner* v. *Keegan,* 275 App. Div. 470; *Matter of O'Grady,* 254 App. Div. 691; *Metropolitan Life Ins. Co.* v. *Taylor,* 147 F. 2d 297.) II. It was error to permit the People's psychiatrists to express an opinion as to defendant's mental condition, basing their opinion on the hospital records, inasmuch as these records were not submitted to the jury, nor allowed to be considered by them. (*People* v. *Strait,* 148 N. Y. 566; *England* v. *United States,* 174 F. 2d 466; *People* v. *Jenman,* 296 N. Y. 269; *People* v. *Wiener,* 248 N. Y. 118; *People* v. *Lewis,* 238 N. Y. 1.) III. The People failed to establish beyond a reasonable doubt that defendant was sane at the time of the commission of the crime. (Penal Law, § 1120; *People* v. *Egnor,* 175 N. Y. 419.) IV. Under the law of the case the verdict is against the weight of the evidence. (*People* v. *Jenman,* 296 N. Y. 269; *People* v. *Wiener,* 248 N. Y. 118; *People* v. *Lewis,* 238 N. Y. 1.)

*Frank S. Hogan, District Attorney* (*Charles W. Manning* and *Richard G. Denzer* of counsel), for respondent. I. Defendant's guilt and his sanity were established beyond a reasonable doubt. (*People* v. *Joyce,* 233 N. Y. 61; *District of Columbia* v. *Armes,* 107 U. S. 519; *McAffee* v. *United States,* 111 F. 2d 199; *Commonwealth* v. *Zelenski,* 287 Mass. 125; *Vinzant* v. *State,* 28 Ala. App. 220.) II. Defendant's sanity at the time of the crime was established beyond a reasonable doubt. (*People* v. *Egnor,* 175 N. Y. 419.) III. The hospital records were admissible in evidence and were properly used as a partial basis for the experts' opinions. (*People* v. *Kohlmeyer,* 284 N. Y. 366; *People* v. *Defore,* 242 N. Y. 13; *People* v. *Bertlini,* 218 N. Y. 584; *People* v. *Gillette,* 191 N. Y. 107.)

FROESSEL, J. Defendant-appellant, twenty-seven years old, is under sentence of death upon a conviction for murder in the first degree. He was indicted for killing one Friedel Frank by beating and strangling her on or about June 2, 1948, and upon the record before us it is manifest that he did so. His defense was predicated principally on the theory of insanity.

Shortly after midnight on June 2, 1948, tenants at 3750 Broadway, New York City, heard a " screech " or " scream " in the areaway. One of the tenants saw a woman lying on the floor in the vestibule, and a man in a tan or light brown suit walking out of the court. The woman was later identified as Miss Friedel Frank, who lived at the aforesaid premises. She died shortly after of a fractured skull, strangulation, and other serious injuries.

Defendant was taken into custody on June 8, 1948, at his home, a short distance from the scene of the crime. According to testimony of members of his family, he was acting " very unusual ", " very queerly " and " strange " on that evening; he cut up pictures, turned on the phonograph " very loud " and told his eighteen-year-old sister that she might not be going to school the next day. Thereupon, defendant's father reported defendant to a police officer stationed nearby, and the latter accompanied the father to the apartment occupied by defendant and his family.

According to this police officer's testimony, when he entered the apartment the radio was playing " so loud you could not hear yourself think or talk "; defendant was " twitching his eyes and lips up and down, and puffing his pipe very fast ". After some conversation, defendant stated that he had something very important to tell the officer, something that would make a big man out of him, and then he said: " ' I am the one that you are looking for. I am the ape man. I am the one that killed a woman on Broadway and 156th Street.' " Thereupon the officer placed him under arrest.

At the police station, defendant first stated that he killed Miss Frank, and later denied it. He was then taken to his home, where he produced a number of articles which were subsequently identified as the property of Miss Frank. Later that same night, defendant narrated a detailed story of the commission of the crime and the events preceding and following, a reiteration of

which is unnecessary here. In the course of the narration, defendant stated he was wearing a tan suit on the night of June 2d. He also disclosed that he found a bracelet in Miss Frank's pocketbook; later, a part of this bracelet was recovered by the police.

On June 9th, defendant made two formal statements to the assistant district attorney, which corresponded with the statement he had made to the detective the preceding evening. In the first of these two statements, defendant said he had " had a few drinks " and " was staggering " just before the attack. He thereupon re-enacted the crime at the scene thereof. The detective to whom he made his statement on June 8th described him as " rational " during his questioning and during the time the assistant district attorney took the first statement from him.

On the same day these formal statements were made, defendant was committed to Bellevue Hospital for psychiatric examination by order of the Magistrate's Court. Thereafter and following the report of the director of the psychopathic division of the department of hospitals, the Court of General Sessions, New York County, on July 19, 1948, ordered that defendant be formally examined in accordance with the provisions of the Code of Criminal Procedure to determine the question of his sanity. The two psychiatrists designated found that defendant was " in such a state of idiocy, imbecility, or insanity, as to be incapable of understanding the charge against him or the proceedings, or of making his defense ", whereupon the court approved and confirmed their report on August 6, 1948, suspended the trial of the indictment until defendant became sane, and committed him to Matteawan State Hospital.

Nearly fifteen months later, and on October 24, 1949, the court ordered defendant transferred from Matteawan to stand trial, its superintendent having certified that he was no longer incapable of understanding the charge, following a visit to the hospital by two representatives of the District Attorney's office. They testified that defendant told them he had feigned insanity at Bellevue, although that hospital's records expressly showed that defendant insisted he was sane. The trial commenced on February 6, 1950.

It is contended on behalf of defendant (1) that he was insane at the time of the commission of the crime; (2) that he was

insane at the time he made his so-called confessions, and (3) that reversible errors were committed in allowing the hospital records in evidence in their entirety and in their use, and that other errors were committed.

The evidence as to defendant's sanity consists chiefly of the testimony of the members of his family; the testimony of the psychiatrists, and the Bellevue and Matteawan hospital records, both of which were admitted in evidence for the limited purpose of " facilitating the questioning of the experts " but were not to be exhibited to the jury " unless the defendant should desire otherwise."

Defendant's mother and two sisters testified at length as to numerous acts of unusual behavior by defendant at various times since his childhood, which we need not here review. Among other things, they stated that defendant entered the Navy at the age of seventeen or eighteen and was discharged after about six months of service; thereafter he was drafted into the Army, and when he returned home after three years of service he was " very sick " with headaches; he had prescriptions from the doctor, stayed in bed two or three weeks " sick with something ", and used headache tablets all the time; upon his return from the Army in 1946, he disappeared for two or three days, going to Governor's Island Hospital. His explanation was that he " felt sick "; thereafter he was " extremely nervous "; he " just went to pieces and he could not control himself. He * * * just blacked out altogether." On several occasions he drank iodine, and asked to be taken to Bellevue. Their evidence with respect to his peculiar behavior over a long period was not insubstantial.

Much of the testimony of the psychiatrists was elicited at a preliminary hearing during the trial to determine whether defendant's confessions should be admitted in evidence. The People called three physicians. Dr. Lichtenstein, medical assistant to the District Attorney in charge of legal medicine and psychiatry, testified that he examined defendant on June 9, 1948, for an hour and a half, that he was present at the formal hearing at Bellevue and participated therein; and, based on his observations and examinations of defendant *and his examination of the Bellevue Hospital record,* it was his opinion that defendant was not suffering from any form of schizophrenia or

any form of insanity " at any time ". Dr. Bellinger, one of three psychiatrists (the other two did not testify) appointed by the court in November, 1949, stated he examined defendant on December 9 and 16, 1949; and, based upon his examination and upon defendant's statements to the District Attorney *and the Bellevue Hospital record,* it was his opinion that defendant was of sound mind on June 8, 1948, and did not suffer from any form of insanity on June 8th, 9th, or thereafter. Dr. Wolff, assistant director of Matteawan State Hospital, testified that he examined defendant and studied *all the data the hospital had on him.* Dr. Wolff's opinion was that defendant did not suffer from schizophrenia but had a " psychosis, with psychopathic personality " — a psychotic episode in reaction to a difficulty in which he found himself — that is, a reactive psychosis. This condition, he stated, arose sometime following defendant's arrest (June 8th) and sometime prior to his admission to Bellevue (June 9th). From the medical point of view, psychosis and insanity are, he agreed, synonymous. He also agreed that at the time defendant was at Matteawan he was insane.

Two physicians testified for defendant. Dr. Cassity, a member of the lunacy commission and psychiatrist in charge of the female criminal department at Bellevue, testified that he personally examined defendant six or ten times from June 9 to July 28, 1948, while he was under observation at Bellevue, and where he was also examined by Dr. Herman and two other psychiatrists. Dr. Cassity also stated that defendant, on June 9 and on July 28, 1948, was in such a state of insanity as to be incapable of understanding the charge against him. The witness discussed the case with the other doctors who examined defendant, and there was no disagreement; the diagnosis was schizophrenia; it was his opinion that such a person would be capable of telling the truth, and would know the nature and quality of his act, but would not know that it was wrong. Dr. Cassity had the impression from defendant's history and from his relatives that defendant's condition had been progressing for several months or a year prior to his admission to Bellevue. Dr. Herman, formerly a psychiatrist and assistant director at Bellevue and presently professor of clinical psychiatry at the New York University Medical Center, was the other psychiatrist

designated with Dr. Cassity to examine defendant. He was of the opinion that on June 9 and on July 28, 1948, defendant was incapable of understanding the charge or of making a defense; he was suffering from schizophrenia, paranoid type; such a person might tell the truth, and know an act was wrong, without understanding the nature or quality of it.

In addition to the foregoing testimony, the People later recalled their psychiatrists, Drs. Lichtenstein and Bellinger. Dr. Lichtenstein was then asked a hypothetical question, containing a summary of the evidence, and was also asked *to take into consideration the Bellevue and Matteawan Hospital records;* in answer to the question, he stated that defendant knew the nature and quality of the act, and that the act was wrong. He also stated that a person suffering from a reactive psychosis is medically insane. Dr. Bellinger, in response to the same hypothetical question, made the same answers.

In the face of such evidence, the question as to defendant's sanity at the time of the alleged confessions (*People* v. *Joyce,* 233 N. Y. 61) as well as at the time of the commission of the crime (Penal Law, § 1120) presented a grave issue in the case, and the hospital records assumed an important role. Defendant contends that the trial court erred in admitting as part of the Bellevue Hospital records (1) a memorandum made by a social service investigator to the effect that the investigator had " contacted ", at the place where defendant was said to have been formerly employed, one Fuesner, who had stated that defendant " showed no abnormal traits "; (2) a letter sent by the assistant district attorney, who prosecuted defendant, to Dr. Herman of Bellevue under date of June 12, 1948, suggesting that a " careful watch " be kept·on defendant when he had visitors, because his sister had been employed taking care of mentally disturbed persons, and Dr. Lichtenstein believed that " she may possibly inculcate certain ideas in her brother's mind with a view towards planning an insanity defense "; (3) a memorandum which Dr. Lichenstein had prepared for the assistant district attorney recording his conclusions as to defendant's mental condition; (4) communications sent to Bellevue by the United States Army and by the Federal Reformatory at Chillicothe, Ohio, which showed defendant's court-martial convictions and also gave certain psychiatric data. Defendant

also objects to the inclusion in the Matteawan Hospital record ot (5) a communication from the Florida State Hospital stating that one " Moses Samuel " had been admitted in 1902, suffering from " Chronic Mania ", and had escaped, and that the hospital had no record of a colored female patient by the name of Samuels said to be Moses' daughter.

At least some of these documents should in no event have been admitted as part of the hospital record, as, e.g., (1) the social service memorandum, (2) the letter sent by the assistant district attorney, and (3) Dr. Lichtenstein's memorandum. It is not the business of a hospital to record (1) the *opinion* of some *layman,* whom an investigator " contacted ", as to the " traits " of a patient, where the informant was under no duty to impart that information; nor (2) the unsolicited opinion of an assistant district attorney that a " careful watch " should be placed over the patient, a warning not even related to defendant's mental condition, but directed rather to possible action by his sister, or (3) the opinion of the District Attorney's medical assistant in charge of *legal* medicine and psychiatry, made, *not* to the hospital, but to an assistant district attorney, giving his conclusions as to defendant's mental condition. None of these documents comes within the purview of the statute; it was not " the regular course of such business [the hospital's] to make such memorandum or record at the time of such act, transaction, occurrence or event, or within a reasonable time thereafter." (Civ. Prac. Act, § 374-a; Code Crim. Pro., § 392; *People* v. *Kohlmeyer,* 284 N. Y. 366, 369; *Johnson* v. *Lutz,* 253 N. Y. 124; *Roberto* v. *Nielson,* 288 N. Y. 581; see, also, *Palmer* v. *Hoffman,* 318 U. S. 109, rehearing denied 318 U. S. 800, and *Del Re* v. *City of New York,* 180 Misc. 525.)

It is true that the Bellevue and Matteawan Hospital records, while admitted in evidence for the limited purpose of " facilitating the questioning of the experts ", were never submitted to the jury, under the trial court's ruling, but a serious error was committed when the People's psychiatrists, Drs. Lichtenstein and Bellinger, were permitted to express their opinions that defendant knew the nature and quality of his act and that the act was wrong based upon a hypothetical question which embraced these very records, including the challenged documents hereinbefore discussed (*Boldt* v. *Murray,* 41 Hun 638,

opinion in 2 N. Y. St. Rep. 232, 234, 235, affd. on opinion below 113 N. Y. 670).

The underlying assumption of virtually all the cases dealing with expert testimony is that the jury must have the facts upon which the expert bases his opinion in order to evaluate the worth of that opinion (*People* v. *Strait*, 148 N. Y. 566, 570; *People* v. *Nino*, 149 N. Y. 317, 326–327; *People* v. *Truck*, 170 N. Y. 203, 212, 216; *People* v. *Faber*, 199 N. Y. 256, 267; *People* v. *Keough*, 276 N. Y. 141, 145–146; *Cobb* v. *United Engineering & Contr. Co.*, 191 N. Y. 475, 482, motion for reargument denied 192 N. Y. 549; see, also, *Link* v. *Sheldon*, 136 N. Y. 1, 9; *People* v. *McElvaine*, 121 N. Y. 250; *Marx* v. *Ontario Beach Hotel & Amusement Co.*, 211 N. Y. 33, 38). As we said in *People* v. *Strait* (*supra*, p. 570): " The witness was an expert on the diseases of the mind, but he was not an expert on determining the facts, where such facts had to be obtained from the statements of others. It was essential that the jury should be informed as to the facts upon which the expert based his conclusions in order to determine whether they were well founded. If the facts were not disclosed, his conclusions could not be controverted."

It is no answer to say that defendant could have requested that the hospital records be exhibited to the jury in accordance with the trial court's ruling that they would not be so exhibited " unless the defendant should desire otherwise." The burden was on the prosecution to prove its case beyond a reasonable doubt and by competent evidence. It was not up to the defendant to cure the People's defective hypothetical question by putting the records before the jury.

Nor can the error be regarded as trivial or harmless. There are a great many items in the hospital records which tend to substantiate defendant's claim of insanity and which may cast serious doubts on the accuracy of the opinions expressed by the People's psychiatrists. Had these hospital records been properly before the jury, as they should have been before the hypothetical question was posed, its verdict might well have been different. To put it otherwise, if the exhibits were at all admissible, they should have been submitted to the jury; if it was improper that the jury should see them, they should not have been received in evidence as a basis for the experts' opinions.

This objection applied with equal force to the testimony given by the People's psychiatrists, and based in part upon the hospital records, that in their opinion defendant was sane when he made his alleged confessions, which testimony was the basis upon which the confessions were admitted in evidence. Without such testimony and the alleged confessions admitted thereunder, the defendant's conviction would not be supported by the remaining evidence in the case.

In the state of the record before us, these errors were prejudicial to the defendant, calling for a reversal of the judgment appealed from. Whatever we may think of his connection with the crime, he was entitled to a fair trial according to law. (*People* v. *Mleczko*, 298 N. Y. 153, 163.) We therefore deem it unnecessary to discuss other alleged errors assigned by defendant as prejudicial.

Accordingly, the judgment of conviction should be reversed. and a new trial ordered.

LOUGHRAN, Ch. J., LEWIS, CONWAY, DESMOND, DYE and FULD, JJ., concur.

Judgment accordingly.