Van Voorhis, J.
Defendant was convicted of felony murder (homicide while engaged in the commission of attempted rape on November 24, 1958) with recommendation of life imprisonment. There was admitted into evidence the report to the County Court of two psychiatrists, appointed at the direction of the court, to the effect that he was capable of understanding the charge and of making his defense (Code Grim. Pro., §§ 870, 659-662). This report of the psychiatrists is dated January 20, 1959, and contains admissions made to them by defendant that he did the acts ascribed to him in the indictment and claimed to constitute the crime which he was charged with having committed two months previously. Section 662 of the Code of Criminal Procedure states that reports of this nature by psychiatrists appointed at the direction of the court are inadmissible. A defendant, under such circumstances, has no alternative but to submit to examinations given by the psychiatrists, and answers given by him to their questions concerning the acts constituting the alleged crime are a form of testimonial compulsion.
The receipt in evidence of this report would clearly constitute reversible error unless the contention of the District Attorney be correct that the report was offered in evidence by defense counsel at the trial. Whether it was offered in evidence on behalf of the defendant, or, if so, whether it was received for all purposes are the main questions presented on this appeal.
There is no doubt that reports of this nature are inadmissible (People v. Samuels, 302 N. Y. 163; People v. Draper, 278 App. Div. 298; People v. Colavecchio, 11 A D 2d 161; People v. Butchino, 13 A D 2d 183). Not only is this for the reason that, in order to determine whether a defendant is capable of making his defense at a trial, the psychiatrists will almost certainly (as they did here) probe the defendant with questions concerning whether he did 'the acts ascribed to him in the indictment, which would compel a defendant to be a witness against himself, but also the standard of judgment provided by sections 658 and 870 of the Code of Criminal Procedure and section 1120 of the Penal Law are different. Capacity to understand the nature of the charge and to defend at the time of the trial contemplate different norms from knowing the nature and quality of the act and that it was wrong, which is the standard of judg *84 ment to be applied in determining whether a defendant is not guilty on the ground of legal insanity.
At the trial counsel for the defendant did offer in evidence the compendious records of Bellevue Hospital regarding appellant. He had had a long’ record of mental deficiency, and had been confined in institutions for the mentally ill for considerable periods of time including three previous confinements at Bellevue. He was sent to Bellevue Hospital for observation, to be sure, after being arrested on the present charge, and the day-to-day records of that hospital would be admissible even though subsequent to the date of the commission of the homicide, if the nature of the alleged insanity was such as to relate back to his condition at the time of the homicide (People v. Samuels, supra). Upon the other hand, the report to the County Court by the psychiatrists on whether he was capable of understanding the ■ charge and undertaking his defense is not part of the hospital records, even though a carbon copy was physically incorporated therein. This report, though based in part upon the specific findings at Bellevue, was made at the instance of the County Court to the County Court and its conclusions were subject to being overruled by the County Court (Code Crim. Pro., §§ 658-662-f). Although connected with Bellevue, these two psychiatrists were acting independently for the information of the court and their report to the court was not more part of the records of Bellevue Hospital than would have been their testimony in court.
When defense counsel at the trial offered the Bellevue Hospital records in evidence, he made no mention of this report rendered to the County Court of the ability of defendant to stand trial, and the mere circumstance that the copy forwarded to the hospital by the Clerk of the court, as he was required to do under section 662 of the Code of Criminal Procedure, was physically bound up with the hospital records does not make it part of them (Cox v. State of New York, 3 N Y 2d 693; Williams v. Alexander, 309 N. Y. 283, 287). Section 374-a of the Civil Practice Act renders admissible only written memoranda where it is “ ‘ the regular course of such business [i.e., the hospital’s] to make such memorandum or record at the time of. such act, transaction, occurrence or event, or within a reasonable time thereafter.’” (People v. Samuels, 302 N. Y. 163, 171, supra, *85 citing People v. Kohlmeyer, 284 N. Y. 366, 369; Johnson v. Luts, 253 N. Y. 124; Roberto v. Nielson, 288 N. Y. 581.) Unless the official report to the County Court was part of the business of the hospital, it was not more admissible under section 374-a than the statement in the hospital records relating to the events leading up to the accident in the Cox or Williams case, or by analogy of the police blotter in Johnson v. Luts. The hospital was not charged with responsibility for making entries concerning the testimony of psychiatrists on its staff in court or their report to the court at its instance. That being so, this report is not to be regarded as having been included by defense counsel at the trial in his offer in evidence of the Bellevue Hospital records.
In rebuttal the prosecuting officer asked the psychiatrist for the People to assume the existence of these incriminating facts stated in the report to the court of the Bellevue psychiatrists concerning defendant’s ability to stand trial. Moreover, in summation the prosecutor referred in detail to this report as stating that the defendant was not in a state of idiocy, imbecility or insanity or unable to prepare his case and that this indicated that he was able to understand the nature and quality of his act and that it was wrong at the time of the commission of the homicide.
Even if this report were regarded as having been offered as part of the Bellevue Hospital records, there is considerable doubt that the trial court did receive it. These bulky and voluminous hospital records were admitted with the following expressed limitations at the trial:
“ Mr. Farrell: Judge, before this is read, am I to understand at the present time that everything in that record is going to be permitted?
“The Court: I don’t know yet. The record has been marked in evidence. I have no way of deleting parts of that. It is impossible.
“ Mr. Farrell: I appreciate that, Judge, but when the exhibit was offered in evidence, if your Honor pleases, I made no objection except, and I think I made it very clear, that as to diagnosis of doctors, I felt that the doctors should be here who made them so that I may question them, not that we just read something from a piece of paper.
*86 “ The Court: No, I’ll permit this statement to go in. As they arise I’ll rule on them.”
In other words, the District Attorney made clear that he was not to he bound by opinions of doctors expressed therein unless they were in court so that they might be interrogated upon the witness stand. The Judge, in effect, sustained that reservation by permitting admissibility of these items to be ruled upon as the questions arose. It would seem that in fairness this ruling extended also to the defendant in the conduct of the trial.
Concerning this it was said at the Appellate Division in the dissenting opinion of Justice Vabente : ‘1 Even if it be true that the defense did offer the section 870 hospital record, nevertheless timely objection was made when the People attempted to use it. That objection, in the interest of justice, should have been sustained. Everything in that record was damaging to the defendant and, if his counsel inadvertently offered it, the defendant should not have been penalized by permitting it to be used in the face of a timely objection. The trial of a criminal case is not like a chess game where once a chessman has been moved, and the hand lifted away, the move is irrevocable. Assuming that defense counsel did offer the hospital record, incident to the section 870 examination, the fact remains he realized his mistake in time and, as the People were about to act on it, he objected. The court was not without power to prevent its use and, in the interest of justice and of a fair trial, the defense’s objection should have been sustained.”
The facts concerning appellant’s alleged insanity at the time of the commission of the homicide indicate that this was far from being a perfunctory defense. He had spent much of his life in mental institutions. It is likely that the defense of insanity had weight with the jury in impelling them to make the recommendation of life imprisonment which juries seldom do in case of so repulsive a crime if committed by a man believed to be sane. Juries are not likely to make recommendations of that kind in that sort of case. There is a good deal to suggest that here the jury compromised by recommending life imprisonment instead of the electric chair on account of doubt concerning his sanity. This interpretation of the jury’s verdict is fortified by the question which the jury asked before reporting its verdict: “Kindly advise us if a verdict of murder with a *87 recommendation that the defendant he imprisoned for the term of his natural life means that he will never be released under any circumstances and will die in prison.”
To this query the court replied in the affirmative, saving only executive clemency. It is rather plain that the jury were thinking that under no circumstances did they intend to allow a man with defendant’s proclivities to be at large, and that by their verdict they would see to it that he would remain incarcerated for life regardless of what instructions they had received regarding the evidence of insanity. In a case where the question of insanity was as close as here, it was especially prejudicial to have utilized against defendant the report of the two psychiatrists to the County Court advising that he was mentally capable of standing trial.
A second serious question is presented concerning whether the alleged confessions by defendant were coerced. Upon the trial the jury heard full and essentially identical renditions of defendant’s confession at 12 different times. The substance of all of them, with minor variations, is contained in the stenographieally recorded confession. Contending that these confessions were coerced, appellant’s counsel points out that, from the time when the detectives entered defendant’s apartment between 2:45 and 3:00 p.m. until he was taken to the 44th Precinct for further questioning at 7:00 p.m., he was subjected to continuous questioning about the killing by relays made up of more than six detectives, three members of the Bronx District Attorney’s Office, the assistant medical examiner, and a deputy chief inspector and an inspector. During the interrogation defendant was disrobed and his private parts examined in the nude in the presence of five members of the police department, and his pubic hair cut from his body with scissors. During the questioning at his apartment defendant insisted that he was innocent of the homicide. At the police station he was questioned until about 9:30 p.m., when he was first given food after his first self-incriminating statement. He relinquished his claim of innocence only after his wife, mother, father, mother-in-law, father-in-law, sister and brother-in-law confronted him at the precinct station, and his wife said that she loved him and wanted him to tell the truth. One of the detectives testified concerning what then occurred: ‘ ‘ Well, when the members of his family left the *88 room we questioned Jerry Both. We said, 6 Now look at what you are doing to your family. Why make them go through this? Why don’t you tell us the truth and straighten this whole thing out? You have to tell us sometime. You might as well tell us now.’ So then he said, ‘ All right, I’ll tell you.’ ”
After making his oral confession, defendant was taken handcuffed with six detectives in two cars to 1485 Nelson Avenue where he pointed out the place where he had hidden the bloodstained rug and to 1406 Ogden Avenue where he located the coat which the victim had been wearing. Defendant was then brought back to the 44th Precinct Station where they arrived between 9:25 and 10:00 p.m. after which he was interrogated for an hour and a half longer by three lawyers together with three detectives. The questioning was continuous and was conducted in the lieutenant’s or commanding officer’s room.
The duration of these periods of questioning and the length of his confinement before charges were preferred may not of themselves have been excessive within the standards of the decided cases, but, even apart from defendant’s testimony as to his physical treatment at the precinct station, the cumulative effect of this barrage of official questioners coming at him in relays with rapid fire, the confrontation and implied rebuke by all of these members of his family, together with the other circumstances of the case including the defendant’s own coneededly feeble mentality, constituted coercion as matter of law in the obtaining of these confessions under the circumstances of this case. The error was aggravated by the repetition with which his confession, in but slightly differing form, was brought to the attention of the jury. The age and inexperience of defendant (Chambers v. Florida, 309 U. S. 227; Haley v. Ohio, 332 U. S. 596), his mental deficiency if not illness (Fikes v. Alabama, 352 U. S. 191; Spano v. New York, 360 U. S. 315; Blackburn v. Alabama, 361 U. S. 199; Reck v. Pate, 367 U. S. 433; Culombe v. Connecticut, 367 U. S. 568), his near illiteracy (Harris v. South Carolina, 338 U. S. 68; White v. Texas, 309 U. S. 631), his arrest and detention without hearing or arraignment (Harris v. South Carolina, supra; Turner v. Pennsylvania, 338 U. S. 62; Watts v. Indiana, 338 U. S. 49; Haley v. Ohio, supra) and without any communication with counsel (Harris v. South Carolina, *89 supra; Ashcraft v. Tennessee, 322 U. S. 143; White v. Texas, supra; Chambers v. Florida, supra), his confrontation with a pregnant wife at a police station urging him to confess, with six other relatives (Rogers v. Richmond, 365 U. 8. 534; Harris v. South Carolina, supra; Culombe v. Connecticut, supra) and the overwhelming numbers and apparent authority of police officers, detectives, doctors, photographers, and members of the District Attorney’s office who subjected defendant, inexperienced in criminal matters, to intensive questioning in mounting crescendo which led up to the alleged confessions, all combined to make his confessions inadmissible under the circumstances of this case. This does not mean that upon the retrial the People would be prevented from proving his identification of objects claimed to have constituted circumstantial evidence of his commission of the homicide.
It may be noted that there is no evidence that appellant committed rape; conviction depends upon the homicide being committed during an attempt at rape.
For these reasons the judgment of conviction must be reversed and a new trial ordered.