Benjamin Altman, J.
Pursuant to CPL 730.30, an order of examination was issued to determine whether the defendant was an "incapacitated person”; that is, whether the defendant as a result of mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense (CPL 730.10, subd 1).
A hearing was held on April 1 and 2, 1976, to determine whether the defendant was an incapacitated person.
The criteria of fitness to stand trial are: (1) the defendant understands the charges; (2) the defendant understands courtroom procedures; (3) the defendant can assist in his defense and assist counsel in the preparation of his defense.
The three psychiatrists, personnel of the Criminal Court of the City of New York, who submitted written reports, all testified at the court’s requests and appeared in this order: (1) Dr. E. Salanga, who found the defendant unfit; (2) Dr. P. Kaminstein, who found the defendant fit; (3) Dr. A.I. Grantz, who found the defendant fit.
Dr. Salanga, in giving her medical background, disclosed that she is a diplómate. (This means that one is certified as a specialist.)
Dr. Salanga testified that she interviewed the defendant for *83 about an hour on January 29, 1976, and apparently was not satisfied in her mind about the capacity or incapacity to stand trial. Consequently, in an unusual procedure she re-examined the defendant on February 2, 1976, and her examination report is dated that day. In her report she diagnosed the defendant as a "schizophrenia, paranoid type” and described the defendant’s thinking as "disorganized, illogical and delusional.”
On March 1, 1976, subsequent to the date of her report, she saw the defendant in a nonclinical setup, i.e., a conference in one of the courtroom "bullpens” between the defendant and his attorney. Dr. Salanga, in her testimony, stressed that the observation of the defendant at this defendant-lawyer conference merely reinforced her view that the defendant is "not fit to stand trial and is in need of psychiatric treatment.” All in all, Dr. Salanga spent some three hours with the defendant. Dr. Salanga was expertly and diligently cross-examined by the Assistant District Attorney for about two and one-half hours and maintained her very firm professional position that the defendant was unfit.
Dr. P. Kaminstein, in giving his extensive medical background, also disclosed that he is a diplómate.
Dr. Kaminstein saw the defendant on February 6, 1976 for about 45 minutes to an hour, perhaps 10 minutes more. This was the only interview. Dr. Kaminstein testified that the defendant suffers from "schizophrenia with a paranoid trend of considerable proportions.” He also stated that the defendant was "easily understood and quite comprehensible” but not entirely "rational.” However, the doctor said, in continuing his testimony, that even though the defendant suffers with "schizophrenia with a paranoid trend of considerable proportions,” this condition did not necessarily make the defendant incompetent to stand trial. (Emphasis added.) The doctor stated that the defendant hallucinates and hears voices.
On cross-examination the doctor was asked if he saw the defendant in a nonclinical setting, would this background be "beneficial to your analysis.” The response was that such nonclinical setting "might be beneficial.” On further cross-examination the doctor said that he might have changed his analysis (in respect to the defendant’s fitness) if he had observed a lawyer-defendant exchange.
Dr. A.I. Grantz, in reciting his medical background, disclosed that he was a board-qualified psychiatrist.
*84 Dr. Grantz saw the defendant on February 4, 1976 for about 45 minutes, perhaps an hour, in his office in the Criminal Court building. This was the only interview. He testified that the defendant has "schizophrenia, simple type; impairment of insight, poor insight of judgment.” Interestingly enough, as in Dr. Kaminstein’s report, no mention of "schizophrenia” per se appeared although both Doctors Kaminstein and Grantz testified that defendant suffered from "schizophrenia.”
Dr. Grantz was pressed on cross-examination to explain what he meant by "poor insight of judgment” and whether the combination of "schizophrenia” and "poor insight of judgment” did not make it difficult for the defendant to meet the criteria of competency. Grantz replied, firmly and readily, that the defendant was fit to stand trial. However, in concluding that defendant was fit to "assist his counsel” (the third criterion) the doctor was rather vague as to how he made that determination. He merely stated that if the defendant was fit for the first two criteria (understanding the charges and understanding courtroom procedures), then he would be competent to "assist counsel.”
Parenthetically, on this particular point, Dr. Kaminstein merely stated that by his conversations with the defendant the doctor knew that defendant could "transpose” his ability to communicate and so "assist his attorney.” Dr. Salanga, the first testifying psychiatrist, in contrast, insisted that defendant was not able to assist in his defense, especially after her observations of defendant with his lawyer in the nonclinical "bullpen” setting.
Finally, Dr. Grantz, when apprised hypothetically of the nonclinical "bullpen” meeting, admitted that a possible reexamination of the defendant might be (not should be) beneficial. Nevertheless, he maintained that in his clinical examination he found the defendant met all three criteria of fitness.
Comparing the description of the defendant by the two psychiatrists who affirmed defendant’s competency, the court notes some variance in their respective reports. One report states defendant is "fairly neat and clean” while the other says defendant has a "somewhat unclean and bizarre appearance.” One report states that defendant hallucinates and hears voices; the other states defendant hears no voices. Was the same defendant being interviewed?
After hearing the testimony and reading the reports of the psychiatric examinations, the court is constrained to suggest *85 that in the future where there is a disagreement between and/or among the court psychiatrists, there should be a follow-up nonclinical examination of a defendant by all or another psychiatrist.
From time to time, the defendant would make outbursts— some quietly, some loudly. The court on these occasions, looking directly at defendant, but speaking to his counsel, requested counsel to contain his client’s outbursts. The defendant would then be silent. The defendant’s last outburst was a general tirade against having the hearing at all and ended with, "I am not crazy!” After all of defendant’s outbursts, he would resume his hearing-long practice of drawing lines and figures on his pants and hat with a bail-point pen.
Defense counsel raised one novel legal point during the early course of the hearing. Upon assignment as the hearing officer, the court, in preparation, read each psychiatrist’s report before the start of the hearing. As it developed initially, there was some uncertainty as to whether the two psychiatrists who found defendant fit would be able to testify. The People moved to have their psychiatric examination reports in evidence as People’s exhibits. Defense counsel objected on the grounds that his right of cross-examination would be denied. The court pointed out that since there was one trier of the facts and that that trier had already read all the reports, it seemed that the court could permit the questioned reports to be introduced and marked in evidence, and further, that the trier of the facts could give all of the evidence its respective probative weight. Counsel stated, in substance, that the court had no right to read the reports prior to the hearing and only had the right if the reports were in evidence. Counsel paralleled his arguments by stressing the prohibition against a Hearing or Trial Judge having a defendant’s criminal record before him.
CPL 730.20 (subd 5) uses the word "submit” the reports to the court. Webster’s Collegiate Dictionary defines "submit” as: (a) to commit to the discretion or judgment of another; (b) to make available; (c) to put forward as an opinion.
If the word "submit” in the statute is to be construed as merely putting or placing the reports in the court file and holding them there until after a controverted hearing is held or confirmation of the reports is moved, the statute would have no function. Moreover, the legislative intent and the *86 concept of the psychiatric examination pursuant to CPL article 730 would be meaningless.
In many instances it has been held that the receipt of a psychiatrist’s report in evidence has been held inadmissible (People v Roth, 11 NY2d 80; People v Szwalla, 31 AD2d 979, affd 26 NY2d 655; People v Lund, 15 AD2d 582; People v Colaveccio, 11 AD2d 161; People v Leach, 42 Misc 2d 143).
The logic behind these decisions is the imbalance created by the official or quasi-official nature given the psychiatrist’s report on the defendant’s mental capacity to stand trial (People v Butchino, 13 AD2d 183).
The next logical step is to ask, where is this imbalance created? The answer is — in the minds of the jurors. The error sought to be avoided is that of placing "the substance of the report of the psychiatrists before the jury by indirection (People v Draper, 278 App Div 298, 304, affd 303 NY 653). (Emphasis added.) That is not the situation here.
The purpose of such a psychiatrist’s report is to state to the court the mental condition of the defendant at the time of examination (People v Leach, supra). This in turn helps the court make the determination as to the defendant’s sanity.
To state that the court should not read the report prior to a hearing is contrary to statutory authority and logic. This court holds that once the reports have been submitted, then there is not only a right but a duty placed upon the court to read said reports.
Another area of interest was counsel’s desire to testify over the strenuous objection by the People that the statute permits "only psychiatrists to testify.” The court denied counsel’s right to testify except as to the "bullpen” meeting, holding that the court had absolute discretion to permit a layman (non-psychiatrist) to testify. The request was academic as counsel withdrew same.
The People had the burden of proving that the defendant was not an incapacitated person by a preponderance of the evidence (People v Santos, 43 AD2d 73; People v Veda, 73 Misc 2d 857; People v Gibbons, 63 Misc 2d 354). This court does not feel that the People have met this burden.
Based on the testimony presented at the hearing, the reports submitted to the court and the court’s own observation *87 of the defendant, the court is satisfied that the defendant is an incapacitated person.