DORIS IANNIELLI, Individually and as Administratrix of the Estate of EDWARD IANNIELLI, SR., Deceased, Appellant, v CONSOLIDATED EDISON COMPANY et al., Respondents; M. H. TREADWELL CORP. et al., Respondents-Appellants.

CONSOLIDATED EDISON COMPANY et al., Third-Party Plaintiffs-Respondents, v INGALLS IRON WORKS Co., Third-Party Defendant-Respondent-Appellant.

INGALLS IRON WORKS Co., Third-Party Plaintiff-Respondent-Appellant, v FOSTER WHEELER CORP., Third-Party Defendant-Respondent.

Second Department, June 2, 1980

* By the Publisher's Editorial Staff.

### APPEARANCES OF COUNSEL

*Sacks & Sacks (Harold M. Harkavy* and *Melvin Sacks* of counsel), for appellant.

*Corcoran, Amabile & Corwin (Paul M. DeCarlo* and *John J. Corcoran* of counsel), for M. H. Treadwell Corp., respondent-appellant.

*Lester Schwab Katz & Dwyer (Steven B. Prystowsky* of counsel), for Consolidated Edison Co. and another, respondents.

*Grubbs, Alio & Donovan (Michael Majewski* and *Joseph D. Ahearn* of counsel), for Ingalls Iron Works Co.

### OPINION OF THE COURT

MARGETT, J.

Plaintiff seeks to recover damages for the personal injuries sustained by her decedent Edward Iannielli, Sr. on July 19, 1973 in an industrial accident.*

■ The main question presented by this appeal is whether a

---

* There is no claim that these injuries caused or contributed to Iannielli's death.

certain memorandum, purportedly to be a statement made by plaintiff's decedent to an accident investigator some three days after the accident, was properly accepted into evidence by the trial court as a "past recollection recorded". We conclude that it was not and therefore plaintiff is entitled to a new trial.

Defendant Consolidated Edison Company (Con Ed), the owner of certain premises located in Astoria, Queens, entered into a contract with defendant Ebasco Services, Inc. (Ebasco), in which Ebasco agreed, among other things, to act as Con Ed's agent in the construction of a power plant on the property. Ebasco hired a number of subcontractors to work on the project, including defendants M. H. Treadwell Corp. (Treadwell), Ingalls Iron Works Co. (Ingalls), and Foster Wheeler Corp. (Foster Wheeler). Ingalls' task was to perform certain steel erection work required for the construction of the plant. Foster Wheeler was hired to perform other steel erection work after Ingalls left the site.

The plaintiff's decedent, Edward Iannielli, Sr., was a structural ironworker employed on the construction site, first by Ingalls and then by Foster Wheeler.

The construction site was divided into vertical elevations, the highest of which was termed the fifth elevation. In the course of its work, Ingalls covered a portion of the fifth elevation with planks as a safety measure. Ordinarily, the planks are placed at right angles to the steel beams of the building superstructure. Since the planks are long enough to rest on several beams, there is no need to tie or lash the planks to the beams. However, in this particular area of the fifth elevation, certain of the beams lay at a different height or elevation than others. To make the plank floor level, it was therefore necessary, as a preliminary step, to place a number of planks lengthwise on top of the beams of lower elevation, thereby bringing those beams up to the height of the beams of higher elevation. These lengthwise planks are called "sleeper" planks. Since the steel beams were 8 inches wide and the planks 12 inches wide, the laying of the sleeper planks created an overlap of 4 inches. To prevent a sleeper plank from moving or tilting, it was tied to the beam with a specific type of wire (No. 9 wire). Once the sleeper planks were laid, other planks were placed crosswise upon them, creating a level floor.

Ingalls left the construction site in April, 1973. In preparation for its departure, Ingalls sold all its planks, including

those installed on the fifth elevation, to Treadwell. Thereafter a jurisdictional dispute arose as to which subcontractor should remove the planks and Ebasco ordered Foster Wheeler to remove them. By July 19, 1973 much of the planking on the fifth elevation had been removed, apparently by Treadwell's employees, but a number of the sleeper planks were still in place.

On the morning of July 19, 1973 the decedent and his partner, Bruce Greenberg, were assigned to take up and remove the remaining sleeper planks at the fifth elevation. Greenberg, the only eyewitness to the accident, testified at the trial on behalf of the plaintiff that between 9 and 9:30 A.M. he and Iannielli got off the elevator at the fifth elevation (188 feet above street level) and walked out on the open steel beams toward the sleeper planks, with Iannielli approximately 10 feet ahead of him. Iannielli walked along one of the sleeper planks without incident. He had taken six or seven steps on a second sleeper plank when the plank tilted to the right causing him to fall from the plank onto a concrete roof 23 feet below. The plank came to rest on its narrow edge alongside the beam.

Greenberg further testified that before the accident occurred he had observed that a No. 9 wire was tied around each end of that plank and the underlying beam; after the plank tilted, it remained attached to the beam by the wire. He stated that he and Iannielli were following common usage and good practice, that an ironworker assumes that a plank tied with No. 9 wire is properly tied. He also stated that if the wire had been properly secured to the plank in the first place, the plank would not have moved or tilted when walked upon. The only time one would have knowledge that the plank was loosely tied was when one stepped on it. He examined the wire after the accident and it had not been untied at any time prior thereto. Greenberg concluded that the plank slipped because the No. 9 wire was loose.

The only evidence disputing Greenberg's account of the accident was a four-page unsigned memorandum in the handwriting of one Michael Noto, who had been an investigator of industrial accidents for more than 30 years. The memorandum, dated July 22, 1973, purports to be the text of a statement made by the decedent to Noto while decedent was in the hospital. Noto testified that he had no independent recollection of visiting Elmhurst General Hospital in July, 1973 with

regard to an accident at the Astoria power plant and his writing did not refresh his recollection as to whether he visited the decedent in that month. However, he testified that he interviewed claimants injured in industrial accidents in the course of his work and that it was his general practice to take statements in his own handwriting and to record immediately the exact response that the claimant made to his question. Upon completing the statement, he would request the person being interviewed to sign it. If the person refused to sign, he would retain the statement unsigned. The memorandum was received over objection as a past recollection recorded.

In a *voir dire* by the plaintiff's attorney taken outside of the presence of the jury, Noto testified that in 1973 he was employed by a Mr. Barecca, one of whose clients was an insurance carrier. It was in his (Noto's) "interest" to find out how the accident occurred and to protect the carrier's interest in any lawsuit. At the time, he was unaware that the carrier insured two of the defendants (Con Ed and Ebasco) and he was under the impression that this was a workers' compensation case.

A motion by the plaintiff's attorney to suppress the statement under CPLR 4519 was denied.

The unsigned memorandum, headed "July 22, 1973. Elmhurst General Hospital", purports to be Iannielli's account of the accident. The memorandum reads in part:

"On Thursday, July 19, 1973, I was working with a gang of about five men and we were removing the planks from the temporary flooring which our own ironworkers had installed perhaps five or six months prior. The flooring was installed for the purpose of providing a protective floor under the operations. We later installed all the work above that level, perhaps three or four levels, including the roof and now we were in the course of removing the safety floor.

"I do not know who put the planks over the stringers. Anyway, I was helping to pick up the planks which were wired to the stringers. While I was removing wires and a cable from the temporary beams, I was injured. I believe the planks were under the beams they were resting on which was impossible to see from the top. After *removing a wire clamp, I stepped on the unsupported edge of a plank.* The planks were 12 inches wide, but all different lengths. And I lost my balance as the plank tipped over and I fell a number of feet to the floor below. I don't recall landing and don't know what

position my body was in as I was conscious but dazed" (emphasis supplied).

No deposition by the decedent was introduced in evidence. The Trial Judge charged the jury:

"If the plaintiff's version as testified to by the witness Bruce Greenberg is accepted by you as correct, then all the defendants are guilty of having violated the Labor Law and in that event your verdict should be for the plaintiff against all of the defendants.

"On the other hand, if you find that the version set forth in the statement allegedly obtained by investigator Noto allegedly from Mr. Iannielli is accepted by you as true, then your verdict should be against the plaintiff and in favor of all the defendants, because what the statement says is that the sleeper plank became unsafe only after Mr. Iannielli removed from it the No. 9 wire with which it had been lashed."

The jury returned a verdict in favor of the defendants.

■ An admission by a party is received at trial as evidence-in-chief as an exception to the hearsay rule (*Rosario v New York City Tr. Auth.,* 73 AD2d 912; Richardson, Evidence [Prince, 10th ed], § 210, p 187). Where "the personal representative sues to recover damages accruing to the deceased before his death, under Estates, Powers and Trusts Law, section 11-3.2 (b), admissions made by the deceased before his death are admissible against the personal representative" (Richardson, Evidence [Prince, 10th ed], § 250, p 219).

At bar, Noto was unable to testify directly as to a conversation he had with Iannielli because he had no independent recollection of any such conversation and the writing did not refresh his recollection. Nor was he able to testify that he knew the memorandum to be correct at the time he made it. The memorandum was admitted, as a past recollection recorded, on his testimony with respect to his habit or course of business.

■ The rule of past recollection recorded is based upon considerations of necessity: "To exclude such a record, when shown to have been honestly made, would be to reject the best and frequently the only means of arriving at truth" (*Halsey v Sinsebaugh,* 15 NY 485, 488). Before a memorandum can be received as a past recollection recorded, the correctness of the statements contained in the memorandum must be verified by the witness (*Brown v Provident Loan Soc. of N. Y.,* 282 NY

453; *McCarthy v Meaney,* 183 NY 190; cf. *People v Caprio,* 25 AD2d 145, affd 18 NY2d 617). "This is ordinarily done by the testimony of the witness that, although he has no present recollection of the facts, he remembers that he made or saw the memorandum about the time of the event and that he knew it to be correct at that time. But if the witness does not remember having seen the memorandum before, he may testify that, from his handwriting, habits, or usual course of business in reference to matters of that nature, he has a present conviction or belief that the statements are correct." (Richardson, Evidence [Prince, 10th ed], § 471, p 462; also to the effect that habit or a course of business is sufficient, see 82 ALR2d 473, § 37, at p 529; 3 Wigmore, Evidence [Chadbourn rev], § 747, p 98, n 3.)

In the earlier cases, records admitted under the doctrine of past recollection recorded were records as to which the recollector and the recorder had no motive to falsify, and as to which there was an affirmative need for accuracy (see, e.g., *Bank of Monroe v Culver,* 2 Hill 531 [entries of bank cashier]; *Halsey v Sinsebaugh,* 15 NY 485, *supra* [notes of testimony made by attorney at previous trial]; *Cole v Jessup,* 10 NY 96 [entries of bank teller]; *Haig v Newton,* 1 Mill Const 423 [entry of notary's clerk]; *Columbia v Harrison,* 2 Mill Const 213 [SC] [entry of town clerk]). The shop book rule, the common-law regular entries rule and its extension through the use of the doctrine of past recollection recorded were replaced by the business records statute (Civ Prac Act, § 374-a, now CPLR 4518, subd [a]; Richardson, Evidence [Prince, 10th ed], §§ 293-296, 298). The legislative "purpose [in enacting former section 374-a] was to secure the enactment of a statute which would afford a more workable rule of evidence in the proof of business transactions under existing business conditions" *(Johnson v Lutz,* 253 NY 124, 127; Richardson, Evidence [Prince, 10th ed] § 298, p 272). The legislative purpose in enacting the Federal statute was similar *(Palmer v Hoffman,* 318 US 109, 112, n).

Under the statute, a police report containing a statement by a party as to how an accident occurred is admissible *(Zaulich v Thompkins Sq. Holding Co.,* 10 AD2d 492; *Chemical Leaman Tank Lines v Stevens,* 21 AD2d 556). In an action to recover damages for personal injuries sustained by the plaintiffs' intestate, an entry in a police blotter containing the intestate account of the accident has been admitted *(Fischer v City of*

*New York,* 207 Misc 528, 533; see discussion by Cooke, J. in *Toll v State of New York,* 32 AD2d 47, 49-50). An accident report furnished to his employer by an employee who was involved in an accident has been received into evidence *(Toll v State of New York, supra,* p 50; *Bromberg v City of New York,* 25 AD2d 885; *Bishin v New York Cent. R. R. Co.,* 20 AD2d 921; Richardson, Evidence [Prince, 10th ed], § 304, p 281). Although the Federal statutory rule is similar to the New York statute, the United States Supreme Court has held that an accident report made by an employee to an official of the company is not admissible under the statute *(Palmer v Hoffman,* 318 US 109, *supra).*

Like most exceptions to the hearsay rule, the doctrine of past recollection recorded is grounded on a guarantee of correctness. During the formative period of the rule in this State, the courts often noted that the willingness to permit the introduction of a record should be directly linked to the apparent trustworthiness of that record.

"It is not to be supposed that officers and clerks in large trading and other business establishments, can call to mind all that has been done in the course of their employment; and when their original entries and memoranda have been duly authenticated, *and there is nothing to excite suspicion,* there can be no great danger in allowing them to be laid before the jury" *(Bank of Monroe v Culver,* 2 Hill 531, 536, *supra;* emphasis supplied).

"To exclude such a record, *when shown to have been honestly made,* would be to reject the best and frequently the only means of arriving at truth" *(Halsey v Sinsebaugh,* 15 NY 485, 488, *supra;* emphasis supplied).

Indeed, in one early case, the court rejected the offered records upon the ground that "they have always been under the control of the plaintiffs, and *open to fraudulent interpolation"* *(Merrill v Ithaca & Owego R. R. Co.,* 16 Wend 586, 600; emphasis supplied). "In the case of business records, the requisite reliability has been found to be furnished because (1) such records are customarily checked as to correctness by systematic balance striking, (2) the regularity and continuity of such records produce habits of precision in the record keeper, (3) business functions in reliance on such records, and (4) employees are required to make accurate records as part of their job, and risk embarrassment and censure if they blun-

der" (5 Weinstein-Korn-Miller, NY Civ Prac, par 4518.03a, p 45-401). Most recently, we held that it is error to admit, as a past recollection recorded, a police accident report which may reflect statements by various, unnamed bystanders *(Muth v J & T Metal Prods. Co.,* 74 AD2d 898).

Records prepared solely for the purpose of litigation are excluded *(People v Samuels,* 302 NY 163; *People v Roth,* 11 NY2d 80; 5 Weinstein-Korn-Miller, NY Civ Prac, par 4518.14; but, see *People v Foster,* 27 NY2d 47, 52, where the court said that "if there are other business reasons which require the records to be made, they should be admissible").

Examining the circumstances at bar with these principles in mind, it is readily apparent that the subject memorandum bears none of the indicia of trustworthiness normally presented by records of past recollection and that the reliability of the memorandum is suspect on at least two major grounds. The unsigned memorandum purports to be an account of the accident given by the plaintiff's decedent to a private investigator of industrial accidents in the hospital only three days after the decedent was severely injured by a 23-foot fall onto a concrete roof. The investigator was unable to recall the decedent's condition when he interviewed him, and did not know whether the decedent had been sedated. He did not know whether the decedent had read the statement or even whether he was physically able to read it. Although it was Noto's habit to ask the person from whom he took a statement to sign it, the memorandum was unsigned. While he often speaks to other people about claimants and at times talks to claimants on the telephone and writes down what they say, he did not know whether he did so in this case.

A second challenge to the trustworthiness of the memorandum stems from the nature of Noto's employment and its relation to this litigation.

At the time Noto claims to have taken the decedent's statement, he was employed by a private investigator, a Mr. Barecca, one of whose clients was the Hartford Insurance Company (Hartford). Although Noto was unaware of this at the time, Hartford is the insurance carrier for both Con Ed and Ebasco. While Noto testified that his purpose was to find out how the accident occurred, he admitted that at the time of his investigation he felt that the issue of liability was potentially important and that it was in his interest to protect Hartford in any lawsuit.

The decedent lived for almost two years after the accident but apparently he had not been deposed before trial.

We note as well that the taking of this statement constituted a violation of section 480 of the Judiciary Law, which makes it "unlawful for any person to enter a hospital for the purpose of negotiating a settlement or obtaining a general release or statement, written or oral, from any person confined in said hospital or sanitarium as a patient, with reference to any personal injuries for which said person is confined in said hospital or sanitarium within fifteen days after the injuries were sustained, unless at least five days prior to the obtaining or procuring of such general release or statement such injured party has signified in writing his willingness that such general release or statement be given."

While the fact that a statement was taken in violation of the statute does not render the statement inadmissible in evidence *(Bloodgood v Lynch,* 293 NY 308; *Mavity v Wehner,* 22 AD2d 1008), the purpose of the statute is "to prevent the victimization of hospitalized persons" *(Fleming v Ponziani,* 29 AD2d 881, 882, affd 24 NY2d 105, referring to the predecessor statute [former Penal Law, § 270-b]). Implicit in this purpose, we believe, is the requirement that any statement obtained in violation of the statute be closely examined as to its trustworthiness. Such scrutiny is all the more necessary in this case because of the unavailability of the injured party to explain or contradict the statement.

While the United States Supreme Court holding *(Palmer v Hoffman,* 318 US 109, *supra),* that a statement made by a train engineer, who died before trial, to an official of the railroad, was not made in the regular course of business and was therefore properly excluded, is contrary to the rule in this State *(Toll v State of New York,* 32 AD2d 47, *supra),* the Supreme Court's reasoning in *Palmer* is particularly relevant here and we quote from the decision at length. After reviewing the historical background of the Federal statute, the Supreme Court said (pp 113-114): "The conduct of a business commonly entails the payment of tort claims incurred by the negligence of its employees. But the fact that a company makes a business out of recording its employees' versions of their accidents does not put those statements in the class of records made 'in the regular course' of the business within the meaning of the Act. If it did, then any law office in the land

could follow the same course, since business as defined in the Act includes the professions. *We would then have a real perversion of a rule designed to facilitate admission of records which experience has shown to be quite trustworthy.* Any business by installing a regular system for recording and preserving its version of accidents for which it was potentially liable could qualify those reports under the Act. The result would be that the Act would cover any system of recording events or occurrences provided it was 'regular' and though it had little or nothing to do with the management or operation of the business as such. *Preparation of cases for trial by virtue of being a 'business' or incidental thereto would obtain the benefits of this liberalized version of the early shop book rule. The probability of trustworthiness of records because they were routine reflections of the day to day operations of a business would be forgotten as the basis of the rule.* See *Conner v. Seattle, R. & S. Ry. Co.,* 56 Wash. 310, 312-313, 105 P. 634. *Regularity of preparation would become the test rather than the character of the records and their earmarks of reliability (Chesapeake & Delaware Canal Co. v. United States,* 250 U.S. 123, 128-129) *acquired from their source and origin and the nature of their compilation.* We cannot so completely empty the words of the Act of their historic meaning. If the Act is to be extended to apply not only to a 'regular course' of a business but also to any 'regular course' of conduct which may have some relationship to business, Congress not this Court must extend it. Such a major change which opens wide the door to avoidance of cross-examination should not be left to implication. Nor is it any answer to say that Congress has provided in the Act that the various circumstances of the making of the record should affect its weight, not its admissibility. That provision comes into play only in case the other requirements of the Act are met" (emphasis supplied).

Considering the facts here, *Palmer (supra)* was prophetic. The conclusion is inescapable that Noto's employment and the circumstances surrounding the making of the subject memorandum were deliberately calculated to circumvent protective decisional and statutory law and are fraught with potential for abuse.

In our opinion, the purported memorandum of the decedent's statement does not reach the level of trustworthiness required for its introduction into evidence as a past recollec-

tion recorded and its admission was prejudicial to the plaintiff. Accordingly, the plaintiff is entitled to a new trial.

In arriving at our determination, we have considered no other issues.

MOLLEN, P. J., DAMIANI and LAZER, JJ., concur.

Judgment of the Supreme Court, Kings County, dated March 23, 1979, reversed, complaint, cross complaints and third-party complaints reinstated, and new trial granted with costs to abide the event.