Chief Judge Fuld
Indicted for murder in the first degree in September of 1964, the defendant pleaded not guilty by reason of insanity and, upon motion by his counsel, he was committed to Marcy State Hospital for a mental examination pursuant to section 658 of the Code of Criminal Procedure. The two psychiatrists who examined him, pursuant to section 662, found him capable of understanding the charges against him and making his defense.[1] In February, 1965, the defendant moved in the Appellate Division, unsuccessfully, for a change of venue of his trial from Herkimer to another county. At the trial, which got under way two months later, the jury returned a verdict of first degree murder against him, and he was sentenced to imprisonment for life. The Appellate Division unanimously affirmed the resulting judgment and, upon the present appeal, the principal arguments advanced by the defendant are (1) that he was deprived of a fair trial by reason of the publicity attending it and by denial of his motion for a change of venue and (2) that he was insane at the time of the commission of the crime.
Little purpose is to be served by detailing more than an outline of the sad story revealed by the record. The defendant was 20 years old at the time of the killing, his victim, Noreen Jones, was 17. Hnable to win her liking, the defendant had subjected the girl and her family to continual harassment and abuse over a three-year period. In February, 1964, several months before the homicide, after a meeting which the District Attorney had arranged between the girl’s parents and the defendant’s father — who was the local police judge — the *346 defendant violently assaulted Moreen and her father. This incident resulted in his being charged with third degree assault, committed to a hospital and, upon his return to court and entry of a guilty plea, his being placed on probation and ordered to obtain medical counseling and guidance assistance.
On the day of the shooting, August 27, 1964, the defendant had twice bothered Moreen and members of her family — the second time by driving past her and calling, “You. You’re next. You. You’re next. ’ ’ When she walked on to the police station to seek help, he followed her and, in the presence of four witnesses, shot her seven times. According to one witness, he said, ‘' There, you son of a bitch, you have made all the trouble you will ever make for me. ’ ’ To police officials who questioned him soon after he was apprehended he said, ‘ ‘ I had to do it. She was getting me in trouble. They were bugging me. I couldn’t take it any more.”

Change of Venue

As indicated above, the defendant sought a change of venue. It is his contention that it was impossible to assemble, from the relatively small population of Herkimer County, a jury uninfluenced by the assertedly prejudicial pretrial newspaper publicity surrounding the case.
Twenty-two days were spent in selecting the jury. Three hundred and fifty jurors were impaneled. Two hundred and fifty-six were examined as to their qualifications and 222 actually interrogated in obtaining the trial jury. Minety-four were excused for legal cause and 51 peremptorily— 29 on peremptory challenges by the People and 22 by the defense. Of all the tales-men examined, less than 25% expressed an opinion as to the guilt or innocence of the defendant. Many sought to be excused either because they knew one or both of the parties involved or had children of the same age. All of the jurors accepted to serve underwent a thorough examination with respect to their qualifications, including possible bias and prejudice by reason of any publicity and its effect upon them, and each of those selected asserted that he would render a fair and impartial verdict based solely on the evidence presented. We merely note at this point that the defense used eight less peremptory challenges than the 30 allowed by statute and that the defendant’s *347 counsel stated that he was satisfied with each and every one of the jurors selected.
It has long been settled that, to entitle a defendant to removal of a criminal action to another county because of pretrial publicity (or for any other reason), it must appear that he cannot obtain a fair and impartial trial in the county where the indictment is pending. (See, e.g., People v. McLaughlin, 150 N. Y. 365, 375; People v. Hyde, 149 App. Div. 131, 134; see, also, People v. Genovese, 10 N Y 2d 478, 481-482; Matter of Murphy v. Supreme Ct., 294 N. Y. 440, 456.) Whether or not a change of venue should be granted rests in the sound discretion of the trial court (see, e.g., People v. Buchalter, 289 N. Y. 244; People v. Hyde, 149 App. Div. 131, 134, supra), and a number of cases have held that newspaper comment alone, even though extensive, “ does not establish inability to get a fair trial.” (People v. Broady, 195 Misc. 349, 350; see People v. Hyde, 149 App. Div. 131, supra.) Moreover, the court’s discretion will not be disturbed unless the newspaper articles are of such a sensational character as to • excite local popular passion and prejudice so that the defendant will not be able to have the fair trial to which he is entitled.
In the case before us, there was no such proof of passion or prejudice. Although the community was small and the defendant’s crime and the events leading up to it widely known, the pretrial newspaper accounts were surprisingly objective. The victim’s funeral and the members of her family were sympathetically portrayed and the defendant’s action was described as having caused a widespread reaction and aroused deep feeling. But there was very little written that could be said to be affirmatively hostile to him. The newspapers brought out his father’s position as Village Police Judge and member of the school board and the fact that his grandfather—whom he had visited shortly before the killing — had been convicted of murder in Herkimer County many years previously. The hospital’s finding that the defendant was sane and able to stand charges was also given prominent coverage. In addition, there were newspaper accounts of an investigation by the Grand Jury and the Board of Supervisors into the conduct of the District Attorney and other officials in connection with their handling of the ¡defendant and of the incidents leading up to the shooting.
*348 Commentators and textwriters have noted the difficulty of maintaining a balance between the defendant’s right to a fair trial and the guarantees of freedom of the press. (See, e.g., G-oldfarb, Public Information, Criminal Trials and the Cause Celebre, 36 N.Y.U.L. Rev. 810; Note, Free Press; Fair Trial —'Rights in Collision, 34 N.Y.U.L. Rev. 1278.) Trials cannot, of course, be held “ in a vacuum, hermetically sealed against rumor and report” Baltimore Radio Show v. State, 193 Md. 300, 330, cert. den. 338 U. S. 912; cf. Marshall v. United States, 360 U. S. 310) and, in light of the "widespread coverage given to so-called “newsworthy” trials — by the press, radio and television, Justice Holmes’ observation in Holt v. United States (218 U. S. 245) is even more relevant and apt today than when he made it (p. 251):
“ If the mere opportunity for prejudice or corruption is to raise a presumption that they exist, it will be hard to maintain a jury trial under conditions of the present day.”
In short, the record demonstrates that the publicity was not of such a character as to require a change of venue. Indeed, a comparison of the news accounts in the present case with the publicity attending the trials of those in which a change of venue was held mandated is persuasive that the court was thoroughly justified in denying the defendant’s application. (See People v. Sepos, 16 N Y 2d 662, affg. 22 A D 2d 1007; People v. Luedecke, 22 A D 2d 636; Estes v. Texas, 381 U. S. 532; Rideau v. Louisiana, 373 U. S. 723; see, also, Sheppard v. Maxwell, 384 U. S. 333.) As bearing on the matter, it is highly significant that defense counsel found it unnecessary to use all of the peremptory challenges available and declared himself satisfied with each of the jurors selected. In such a situation, it is established, the defendant will not be heard to complain of the denial of a motion for a change of venue. (See, e.g., People v. Bonier, 189 N. Y. 108,110-111; People v. Warder, 231 App. Div. 215, 221.)

The Defendant’s Sanity

The psychiatric experts of the defense and the prosecution gave contradictory views as to whether the shooting took place *349 during a “ psychotic episode,” that is, during a period when the defendant was not responsible for his actions. We anticipate by observing that, despite the conflict, there was more than sufficient evidence from which a jury was privileged to conclude that the defendant was sane and able to premeditate the crime and intend to kill Noreen.[2] Controversy arises, primarily, with respect to the defendant’s claim that error was committed in admitting certain evidence regarding his mental condition and in keeping other evidence bearing thereon from the jury.
The defendant undoubtedly suffered from a “psychopathic personality ”. There was a long history of defiance of authority and anti-social behavior with ‘ ‘ psychopathic trait disturbance ” in his childhood and youth. A psychologist (Dr. Sidney Orgel), who testified in the defendant’s behalf, declared that he had superior intelligence but an immature, anti-social, psychopathic character. It was his opinion that the defendant did not know the nature and quality of his actions and was not able to distinguish right from wrong or to form a conscious, deliberate intent to kill Moreen. He said that the defendant experienced “a very acute psychotic episode” in which he was “ under conditions of extreme rage, that he [had no] control ” and that this condition began before the shooting and lasted several hours, although he was uncertain about when it began. He described the episode as involving a ‘1 kind of amnesia ’ ’ during which the defendant would be incapable of thinking rationally. Another expert for the' defendant (Dr. Eugene Boudreau) expressed himself in similar fashion, observing, in addition, that the defendant was “possibly” “amnesic” for much of the whole period.
*350 In rebuttal, the People called two doctors from Marcy State Hospital (Dr. Irving Jacobs and Dr. Newton Bigelow) who had examined the defendant there. It was the opinion of both of them that the defendant was a ‘1 psychopathic personality, ’ ’ emotionally unstable, but ‘ ‘ without mental disorder ’ ’; that his behavior was not ‘1 delusional or hallucinated ’[3] ’ f that he knew the nature and quality of his acts and was capable of differentiating between right and wrong;3 [4] that he was capable of forming a deliberate design to kill Noreen and of premeditating the act.
The defendant maintains that the trial court committed reversible error in its treatment of the testimony of the People’s psychiatric experts. First, the defendant maintains — citing People v. Draper (303 N. Y. 653, affg. 278 App. Div. 298) and People v. Samuels (302 N. Y. 163)—that their opinions with respect to his sanity were improperly based upon certain hospital records of tests and examinations which were not produced for the jury’s consideration. Second, he urges that the psychiatrists’ report of the defendant’s mental condition, which section 662 of the Code of Criminal Procedure provides may not be received in evidence at the trial, was erroneously admitted “ by indirection.” And, finally, the defendant objects to the admission of the postindictment, allegedly incriminatory, statements which he gave to the psychiatrists at Marcy State Hospital. We consider each of these arguments.
*351 Prior to the enactment of the CPLR, a jury had to be presented with the facts upon which an expert witness based his opinion (see, e.g., People v. Keough, 276 N. Y. 141, 145-146; People v. Strait, 148 N. Y. 566, 570), and, as a general rule, where a psychiatric expert considered hospital records in arriving at an opinion with respect to the defendant’s sanity, those records had to be exhibited to the jury. (See, e.g., People v. Draper, 303 N. Y. 653, affg. 278 App. Div. 298, supra; People v. Samuels, 302 N. Y. 163, supra; People v. Mathias, 20 A D 2d 696.) In the present case, the various tests and examinations to which the defendant was subjected—the records of which were not produced at the trial—served simply to rule out the possibility of organic brain damage or to substantiate the findings of all of the expert witnesses, both those for the People and those for the defense, that the defendant was a psychopathic individual. In sharp contrast to the situation presented in the cited cases, they played a comparatively small role in the process by which the People’s experts arrived at their opinions, and, beyond that, Dr. Jacobs was thoroughly cross-examined about these tests and examinations so that the jurors were made aware of their nature and purpose.
Be that as it may, the strict rule set forth in the cited decisions has been modified by OPLR 4515. (See 5 Weinstein-Korn-Miller, N. Y. Civ. Prac., §§ 4515.01, 4515.03.) That provision requires, in part, that, unless the court orders otherwise, ‘ ‘ an expert * * * witness may state his opinion and reasons without first specifying the data upon which it is based”; the witness may, the statute continues, be required to furnish such data ‘‘ [u]pon cross-examination”.[5] Thus, the procedure employed in the examination of the People’s experts makes it apparent that the demands of the law in this area, as reflected both in decision and statute, were fully satisfied in the case before us.
There is no support in fact for the defendant’s further claim that the report of the psychiatrists was improperly received in evidence by “ indirection (People v. Draper, 278 App. *352 Div. 298, 304, affd. 303 N. Y. 653, supra; see, also, People v. Colavecchio, 11 A D 2d 161, 164.) The same psychiatrists also testified upon the trial with respect to the defendant’s sanity at the time of the shooting hut there was nothing improper about this. (See, e.g., People v. Butchino, 13 A D 2d 183.) Their testimony was subject to thorough cross-examination. The report itself, however, was not mentioned by them or by any one else.
The use upon the trial of his statements to the People’s psychiatrists, the defendant maintains—citing People v. Waterman (9 N Y 2d 561) —violated his right against self incrimination and his right to counsel. He also objects to their admission upon the ground that his examination was solely to determine his capacity to stand trial and urges that it was “ unfair ” to use such statements to establish his sanity at the time of the homicide, at least without notice that he was to be examined for that purpose.
Quite apart from the fact that the defendant’s failure to object upon the trial precludes him from now complaining (see, e.g., People v. De Renzzio, 19 N Y 2d 45; People v. Castro, 19 N Y 2d 14), his argument must fail for other reasons as well. Most importantly, the statements from the doctors which the People introduced contained nothing that was really incriminating. In point of fact, those portions of the statements relating to the commission of the crime were actually excluded from evidence upon defense counsel’s request. Indeed, since the defendant himself had requested the mental examination, he may not complain that his privilege against self incrimination or his right to counsel was violated. (Cf., e.g., Thornton v. Corcoran, 407 F. 2d 695, 700-701.)
Although the defendant now maintains, in effect, that, as far as he knew, his examination was limited to his mental capacity to stand trial, defense counsel could not have been unaware that the examination would cover his mental condition at the time of ythe crime as well. The court, in directing the mental examination of the defendant, specified that it was to be made “ pursuant to Section (658) of the ’Code”. It is highly significant that that section requires an examination—“ to determine the question of * * # sanity”—not only if “there is reasonable ground for believing ’ ’ that the defendant ‘ ‘ is incapable * * * of making his defense” but also “if the *353 defendant makes a plea of insanity to the indictment As noted, it was the defendant’s own counsel who requested the examination. Although, in so doing, he questioned his client’s ability to stand trial, he went further, expressly declaring that the defense was to be not guilty by reason of insanity. Since the court ordered the defendant to be committed for examination for a period of up to 60 days and since he actually remained in the hospital for 40 days, counsel must have realized — and acquiesced in the prescript-—-that the defendant’s examination was not to be limited to a determination of his competency to stand trial. If there could be any doubt about this, it is dispelled by his cross-examination of the People’s experts.
The need for a full scale mental examination is obvious. (See, e.g., Alexander v. United States, 380 F. 2d 33, 39; Winn v. United States, 270 F. 2d 326, 327, safra.) As a Federal Court of Appeals wrote in the Alexander case (380 F. 2d, at p. 39), 1 ‘ It would violate judicial common sense to permit a defendant to invoke the defense of insanity and foreclose the Government from the benefit of a mental examination to meet this issue.” Here, as indicated, there can be no question that the mental examination actually conducted was thorough and intensive enough to enable the doctors to express an opinion with respect to the defendant’s mental condition at the time of the crime, particularly in view of the interval of but a few months between the two events. (See, e.g., Birdsell v. United States, 346 F. 2d 775, 780; cert. den. 382 U. S. 963.)
The ease decided by the Court of Appeals for the Second Circuit upon which the defendant relies — United States v. Driscoll (399 F. 2d 135) —-manifestly has no application in the present case. There, unlike the court order in the case before us, the order for that defendant’s examination was expressly limited to a determination of his ‘ ‘ mental competency to understand the proceedings against him and properly to assist in his own defense” (p. 137). And, beyond that, the psychiatrists, who examined him solely for such purpose, were permitted to testify to his mental state some five “ years before the trial ” (p. 137).
Of the defendant’s remaining points, only one, in our judgment, merits consideration. He challenges the constitutionality of section 663 of the Judiciary Law which prohibits the selec *354 tion of a person for the Grand Jury or for a jury in a criminal action who states that he has conscientious scruples against the death penalty which would prevent him from finding a verdict of guilt of any crime punishable by death. There is no merit to this argument. In the first place, no problem arises with such a statute where, as here, the defendant receives a sentence of life imprisonment. (See, e.g., Bumper v. North Carolina, 391 U. S. 543, 545.) In the second place, the type of statute which the Supreme Court condemned in Witherspoon v. Illinois (391 U. S. 510) is one which would permit exclusion of a juror with conscientious scruples without regard to whether such scruples would prevent him from rendering a fair verdict on the question of guilt. Since the New York statute does not operate unless the conscientious scruples would prevent the rendition of a fair verdict, it is preserved from the unconstitutionality asserted by the defendant. (See, e.g., Witherspoon v. Illinois, 391 U. S. 510, supra; Crawford v. Bounds, 395 F. 2d 297.) More specifically, as the court indicated in Witherspoon, legislation would be stamped as invalid only if it allowed for a jury which falls “ short of that impartiality to which [a defendant] was entitled under the Sixth and Fourteenth Amendments ” (391 U. S., at p. 518).
The judgment of conviction should be affirmed.
Judges Burke, Scileppi, Bergan, Keating, B keitel and Jasen concur.
Judgment affirmed.

. Although .the report submitted by the .psychiatrists was limited to an evaluation of the defendant’s capacity to stand trial, the examination specified by section 658, and ordered by the court, was not so limited, and properly so. “ [T]he prosecutor who knows that the accused’s mental state at the time of the crime will be the critical issue at the trial, has an obligation,” a Federal Court of Appeals has observed, “ to see to it that any pre-trial mental examination of the accused that may .be ordered .be broad enough to cast light on that issue.” (Winn v. United States, 270 F. 2d 326, 327, cert. den. 365 U. S. 848; see Henderson V. United States, 360 F. 2d 514, 518; Blunt v. United States, 244 F. 2d 355, 364.)

. Upon their direct case, the People did not offer evidence of the defendant’s sanity when the shooting occurred. Only after the defendant had sought to prove that he was insane at that time did the prosecution, in rebuttal, offer countervailing testimony that he was sane. The defendant contends that the court should have dismissed the indictment at the close of the People’s case in the light of the then uneontroverted proof of his insanity. However, the People did not have to prove, initially, that the defendant was sane (see, e.g., People v. Egnor, 175 N. Y. 419, 426); the proof which they offered upon rebuttal being sufficient, they had met their duty of establishing “ on the whole case ” (People V. Kelly, 302 N. Y. 512, 515) that the defendant was sane.

. More specifically, Dr. Jacobs testified: “He did not live in a pseudo-community of his own, which we see in an insane person, not an unreal situation, he lived in a real situation. * * * the psychopath differs from all other types of personality trait disturbances in that their unconscious feelings that are present in their unconscious mind and their unconscious details and their unconscious attitudes are — become part of their character, their character structure, and this part is unconscious and they can’t control. When an episode happens to them they reduce anxiety and tension. They then act out to relieve their anxiety. Their acting out is done on a conscious level. They know they are doing this, more or less, they could control this. If they could not, our prisons would be empty and our mental hospitals would be filled with psychopaths.”

. Since the defendant was tried in April and May of 1965, the question of bis sanity was decided under the law as it stood prior to the amendment of section 1120 of the former Penal Law in July, 1965 (L. 1965, eh. 593, replaced by § 30.05 of new Penal Law [L. 1965, eh. 1030, eff. -Sept. 1, 1967]).

. The full text of .CPLR 4515 reads in this way: “ Unless the court orders otherwise, questions calling for the opinion of an expert witness need not ¡be hypothetical in form, and the witness may state his opinion and reasons without first specifying the data upon which it is based. Upon cross-examination, he may be required to specify the data and other criteria supporting the opinion.”