THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, v KATHY BOUDIN et al., Defendants.

Second Department, December 15, 1982

### APPEARANCES OF COUNSEL

*Frankfurt, Garbus, Klein & Selz* (*Martin Garbus* of counsel) and *Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P. C.* (*Leonard I. Weinglass* and *Leonard B. Boudin* of counsel), for Kathy Boudin, defendant.

*Evelyn Williams* for defendant Brown.

*Kenneth Gribetz, District Attorney* (*John S. Edwards* of counsel), for plaintiff.

*Richard Emery* and *Steven R. Shapiro* for the New York Civil Liberties Union, *amicus curiae.*

*Per Curiam.*

On October 20, 1981, in the course of a robbery at the Nanuet Mall in Rockland County, a Brink's security guard was killed. Shortly thereafter, while attempting to apprehend the suspected perpetrators, two Rockland County police officers were also shot and killed. Movant Kathy Boudin and defendants Clark, Brown, Weems, Gilbert and Burns were subsequently apprehended and now stand jointly charged with various crimes arising out of the incident.

Following their indictment, Ms. Boudin and three of her codefendants moved pursuant to CPL 230.20 for a change of venue. They alleged; *inter alia,* that the prejudicial character and intensity of local publicity, coupled with the charged emotional atmosphere in Rockland County created as a result of the nature of the crime, made it impossible to select a fair and impartial jury. Upon review of the papers then before us, we found that the evidence submitted was not such as to suggest that the selection of a fair and impartial jury was necessarily precluded. Accordingly, we denied the motions as premature, holding that "a proper determination of the claim must await the results of *voir dire*" (*People v Boudin,* 87 AD2d 133, 135). We specified that "[d]efendants may renew their motions to change venue following *voir dire* if it should then reasonably appear that it is impossible to select an impartial and fairly constituted jury" (*supra,* p 136).

By order to show cause dated November 12, 1982, defendant Boudin has renewed her application for a change of venue. In essence, she argues that evidence gathered subsequent to our determination establishes that she is in fact entitled to a change of venue, and that there is no longer any need to await *voir dire* in order to demonstrate that fact.

Following oral argument, this court, *sua sponte,* issued an order, dated November 30, 1982, amending Ms. Boudin's order to show cause. The amendment required, *inter alia,* that the papers and exhibits submitted in support of and in opposition to the application be served upon each of the codefendants, and directed that each show cause why the entire action should not be removed from Rockland County to a superior court of another county.

Defendant Brown has now joined in Ms. Boudin's application for a change of venue. Defendants Clark, Weems, Gilbert and Burns have failed to submit any response, although affidavits have been filed with this court attesting to the fact that each of them has been duly served in accordance with our order. We deem such failure to respond to be an implicit admission that they can proffer no reason why venue should not be changed and that they do not oppose the application.

In seeking a pre-*voir dire* change of venue, defendant Boudin contends, as indeed she must, that her case is extraordinary. Evidence of widespread publicity, even when supported by the results of surveys of the attitudes of potential jurors, is generally regarded as nothing more than some proof that a fair trial may be impossible in the locality in which the crime occurred. As the Supreme Court has observed, "[i]f the mere opportunity for prejudice * * * is to raise a presumption that [it] exist[s], it will be hard to maintain jury trial under the conditions of the present day" (*Holt v United States,* 218 US 245, 251 [HOLMES, J.]). Indeed, it seems well settled that pretrial publicity, even if pervasive and concentrated, does not necessarily lead to an unfair trial (see, e.g., *Nebraska Press Assn. v Stuart,* 427 US 539, 565; *People v DiPiazza,* 24 NY2d 342, 347; *People v Harris,* 84 AD2d 63, 100, affd 57 NY2d 335). And, as to surveys of community attitudes, courts often do well to rely "less heavily on a poll taken in private by private pollsters and paid for by one side than on a recorded, comprehensive *voir dire* examination conducted by the judge in the presence of all parties and their counsel pursuant to procedures, practices and principles developed by the common law since the reign of Henry II" (*United States v Haldeman,* 559 F2d 31, 64, n 43, cert den *sub nom. Ehrlichman v United States,* 431 US 933). Thus, our earlier determination to deny Ms. Boudin's application for a change of venue, pending the results of *voir dire,* was consistent with the great majority of decisions dealing with such pre-*voir dire* motions (see, e.g., *People v Barnes,* 86 AD2d 781; *People v Shedrick,* 83 AD2d 988; *People v Bedell,* 73 AD2d 1045; *People v Griffin,* 70 AD2d 1059; *People v Hurley,* 67 AD2d 823; *People v Calogero,* 64 AD2d 1010; *People v Poret,* 64

AD2d 1010; *People v Morin,* 56 AD2d 715; *People v Brown,* 54 AD2d 598; *People v Coleates,* 53 AD2d 1018; *People v Gray,* 51 AD2d 889; *People v Hatch,* 46 AD2d 721; *People v Little,* 45 AD2d 982; *People v Sekou,* 45 AD2d 982, app dsmd 35 NY2d 844; see, also, *United States ex rel. Darcy v Handy,* 351 US 454, 462; *United States v Haldeman, supra).*

That is not to say, however, that a change of venue may never be granted before *voir dire.* It is true that *voir dire* is generally the most effective means for determining whether a fair and impartial jury can be impaneled. Nevertheless, it may not always successfully root out prejudice and therefore does not always guarantee the right to a fair trial (see *Groppi v Wisconsin,* 400 US 505, 510). No matter how solemnly given, a juror's statement that he has not been influenced by prejudicial publicity and is capable of affording the defendant a fair trial is not necessarily dispositive (see, e.g., *Marshall v United States,* 360 US 310, 312; cf. *Irvin v Dowd,* 366 US 717, 722-723).

Thus, there are a number of cases in which courts, either prior to *voir dire* or without reference thereto, have held that exceptional circumstances warranted a change of venue (see, e.g., *Rideau v Louisiana,* 373 US 723 [repeated television broadcasts of lengthy interview of defendant in which he admitted the commission of the charged murder]; *People v Pratt,* 27 AD2d 199 [GABRIELLI, J.] [testimony adduced and findings made at pretrial *Huntley* hearing widely publicized before selection of jury]; *People v Marturano,* 24 AD2d 733 [widespread publication of court's ruling on suppression motion with detailed rendition of testimony adduced at pretrial hearing]; *People v Luedecke,* 22 AD2d 636 [television broadcast of defendant's re-enactment of the crime]; *People v Martin,* 19 NY2d 864 [television broadcast of damaging interviews with defendant permitted by police]; see, also, *Irvin v Dowd, supra; People v Sepos,* 22 AD2d 1007, affd 16 NY2d 662).

With these principles in mind, then, we turn to the evidence presented to determine whether this is one of the exceptional cases in which a pre-*voir dire* change of venue should be ordered.

Among the factors considered in reaching our earlier determination was the timing of the motion itself. The application was made several months in advance of the scheduled trial date and, ordinarily, the intensive news coverage accorded even to a crime of this nature could well be expected to abate with the passage of time, thus permitting "the fires of prejudice [to] cool" (*Groppi v Wisconsin, supra,* p 510; see, also, *Stroble v California,* 343 US 181, 192). The undisputed evidence now before us, however, makes plain that any such expectation has not come to pass in the case at bar.

In the 50-day period ending November 2, 1982, fully 76 news articles appeared in the local press concerning the case. Thirty-two occupied front-page space and were accompanied by more than 50 photographs. The coverage surpassed that of any other story even in this pre-election period, and was carried by the *Journal-News,* a newspaper received by two thirds of the households in Rockland County. The articles, *inter alia,* repeatedly reviewed the facts of the crime and pointed out the heavy cost to be borne by the taxpayers on account of the court proceedings. They frequently highlighted the continuing anguish of the community and the families of the victims, and publicized the determination of many never to forget the slain officers and to punish their killers. Indeed, the *Journal-News,* in an apparent attempt to increase circulation, advertised at newsstands that it carried the "FRESHEST NEWS OF THE BRINKS CASE".

The following is illustrative of the articles in question. On July 26, 1982, the *Journal-News* ran the second installment of a three-part series entitled, "The Brink's Case — A Radical Journey." The installment itself was entitled, "Boudin's Life Underground", and traced Ms. Boudin's alleged connection to an organization known as the Weather Underground which was said to have been responsible over a period of years for a wave of murders, robberies and bombings. On September 13, 1982, the paper ran an article entitled, "A Who's Who in the pretrial hearings". Ms. Boudin was described as "a leader of Weather Underground", who in 1970 had escaped from an explosion in a Manhattan townhouse which had killed

three members of the organization. On September 22, 1982, the *Journal-News* detailed the testimony of a correction officer who had apprehended Ms. Boudin. The testimony was given at a pretrial hearing held to test the admissibility of the officer's proposed in-court identification of Boudin, and the story noted that, at the hearing, the officer "identified Ms. Boudin and one of her codefendants * * * as participants in the shootout". On September 28, 1982, the *Journal-News* ran a front-page story reporting that "[f]our suspected members of the Puerto Rican nationalist group FALN, including two arrested on federal charges * * * visited Rockland Brink's suspects on * * * the same day the organization took credit for a Manhattan bomb blast". The story quoted the Rockland Sheriff as commenting that such visits were among "the reasons for the tight security". On October 17, 1982, the *Journal-News* ran a front-page story which was the first in a series marking the anniversary of the crime. In describing the series, the article read: "In this first part, The Journal-News looks at the nationwide terrorist network that federal authorities say has begun to unravel as a result of the Brink's case investigation". And, on November 10, 1982, the *Journal-News* reported that "[a] document seized from an accused member of the Brink's robbery-murder gang * * * may hold clues to a planned attempt to break other suspects in the case out of the Rockland County Jail".

Moreover, the press coverage of the case continued unabated after the submission of the instant motion. On November 19, 1982, the *Journal-News* ran a front-page article under the headline, "Brink's case a day in reign of terror?" The article read in part, "The Rockland Brink's robbery was one episode in a five-year racketeering conspiracy that involved at least 19 people and included the New Jersey prison break of convicted cop-killer Joanne Chesimard, federal authorities charge."

As the foregoing clearly demonstrates, there has been intensive, localized, continuing and prejudicial publicity surrounding Ms. Boudin's prosecution. Damaging testimony of untested admissibility has been widely publicized in the community from which the jury is yet to be drawn (see *People v Pratt,* 27 AD2d 199, *supra; People v Martu-*

*rano,* 24 AD2d 733, *supra).* And, far more troubling, there have been frequent reports of Ms. Boudin's alleged connection to criminal organizations and activities, all unproven and uncharged, and all likely inadmissible at her trial. In a similar context, the Supreme Court has observed: "We have here the exposure of jurors to information of a character which * * * [is] so prejudicial it could not be directly offered as evidence. The prejudice to the defendant is almost certain to be as great when that evidence reaches the jury through news accounts as when it is a part of the prosecution's evidence * * * It may indeed be greater for it is then not tempered by protective procedures" (*Marshall v United States,* 360 US 310, 312-313, *supra;* see, also, *Irvin v Dowd,* 366 US 717, 729, *supra* [FRANKFURTER, J., concurring]; *Patterson v Colorado,* 205 US 454, 462).

We do not question the *Journal-News'* right to publish these articles and we yield to none in our regard and concern for the unfettered rights of the press under our First Amendment. Nevertheless, it is well settled that "[n]ewspapers, in the enjoyment of their constitutional rights, may not deprive accused persons of their right to a fair trial" *Shepherd v Florida,* 341 US 50, 53 [concurring opn of JACKSON, J., in which FRANKFURTER, J., joined]). Where that right is seriously threatened by publicity, courts are under a constitutional obligation to take "strong measures to ensure that the balance is never weighed against the accused" (*Sheppard v Maxwell,* 384 US 333, 362).

Moreover, in resolving the motion before us, we do not rely solely on the existence of massive pretrial publicity. Defendant Boudin has submitted the results of a survey, conducted by a professional polling organization, purportedly demonstrating that selection of a fair and impartial jury in Rockland County will be most difficult. We do not accept the survey results at face value as they have been severely challenged by experts for the prosecution. Indeed, the District Attorney has submitted the results of his own survey which are somewhat at odds with Boudin's. Nevertheless, the defendant's survey must be accorded some weight, and it strongly suggests that there is a deep and abiding resentment in Rockland County against the defen-

dants and that a large segment of the community is convinced that all of the defendants are guilty as charged. The strong climate of opinion in the county, and the anger and outrage directed at the defendants seem well documented and very strong.

It should be noted that, even in the face of the evidence submitted, we do not here conclude that under no circumstances could a fair and impartial jury to hear this case be found in Rockland County. Nevertheless, as demonstrated by the record before us, the process of jury selection in Rockland County, which will undoubtedly be both protracted and burdensome, will in all likelihood prove futile. In such cases, a pre-*voir dire* change of venue is often advisable (see *People v Culhane,* 33 NY2d 90, 110).

CPL 230.20 (subd 2) provides that a change of venue may be ordered where the defendant demonstrates "reasonable cause to believe that a fair and impartial trial cannot be had" in the county in which the crime occurred. Based upon all of the foregoing, we hold that defendant Boudin has now established such reasonable cause, and we conclude that, in the interest of justice, her motion should be granted.

As to the remaining defendants, it appears that they too have been subject to massive and prejudicial pretrial publicity in Rockland County and that similar community attitudes exist against them. As previously noted, although only one of the codefendants has joined in Ms. Boudin's application, none has objected to a change of venue. In such circumstances, it is appropriate that venue of the entire action be changed (see *People v Kuss,* 30 AD2d 529; *People v Jackson,* 114 App Div 697, 710).

The selection of an appropriate venue presents a delicate and difficult task. Contrary to the defendants' contentions, we are not obligated to choose a county whose population is more "diverse" than Rockland County's, for as the Court of Appeals has observed, "within reasonable limits, the community to which the trial is transferred should reflect the character of the county where the crime was committed" (*People v Goldswer,* 39 NY2d 656, 663). It has also been said, although it is far from an inflexible rule, that "where

the place of trial is changed, an adjoining county should be selected" (*People v Baker,* 3 Parker Cr Rep 181, 198).

With these guidelines in mind, we conclude that the most appropriate forum for the trial of this case is Orange County. It both affords a convenient, nearby locale and provides an opportunity for adequate security for the trial. Moreover, according to the latest United States census, Orange County and Rockland County have populations of almost identical size, with racial and age breakdowns which are markedly similar.

We note that defendant Boudin has specifically challenged the appropriateness of the adjoining County of Westchester. She alleges that Westchester County is serviced primarily by 10 newspapers all of which are under the same ownership and have carried identical articles about the case as the *Rockland Journal-News.* The same is not true of Orange County which is not serviced by papers in that chain. And there is no indication that the case has received the same intensive and prominent news coverage in Orange County that it has in Rockland County.

Moreover, as earlier indicated, our decision here does not rest primarily upon the extent of the publicity in Rockland County but, equally important, upon evidence of strong and deeply held community bias against the defendants in that county. Indeed, as Ms. Boudin's counsel argued in support of her motion to renew: "The claim is not here being made that it is prejudicial pretrial publicity which has thwarted any chance for a fair and impartial jury * * * [T]he thrust of Ms. Boudin's complaint is not directed at 'the mere existence of any preconceived notion as to her guilt or innocence' * * * Rather, it is premised on the 'pattern of deep and bitter prejudice' that resides within the hearts and minds of the community residents * * * It is their inextricable involvement on a deeply personal level into the matrix of this case that requires a change of venue."

There is no evidence remotely suggesting that within the County of Orange there exists a "pattern of deep and bitter prejudice" against the defendants arising out of the community's "inextricable involvement on a deeply personal level into the matrix of this case".

Accordingly, the action under consolidated Rockland County Indictments Nos. 81-285 and 82-6, as against all defendants named therein, shall be removed from the County Court of Rockland to the County Court of Orange County.

MOLLEN, P. J., DAMIANI, TITONE, LAZER and MANGANO, JJ., concur.

Motion granted.