THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, v ROBERT BRENSIC, Defendant.

Second Department, March 25, 1988

### APPEARANCES OF COUNSEL

*Frank A. Bress* for defendant.

*Patrick Henry, District Attorney (Timothy Mazzei* and *Demetri M. Jones* of counsel), for plaintiff.

### OPINION OF THE COURT

Per Curiam.

█ The defendant moves pursuant to CPL 230.20 (2) for a change of venue of his trial on indictment No. 2678/79 following completion of jury selection upon the ground that he cannot obtain a fair and impartial trial in the county in which he is presently being retried on charges arising out of the brutal and tragic murder of a 13-year-old youth. The People have consented to the application and, following our review of the papers submitted by both sides, having heard oral argument on the motion, and upon our independent examination of the lengthy transcript of the jury selection process herein, we conclude that the motion should be granted.

The defendant was charged in indictment No. 2678/79, along with three others, Peter and Michael Quartararo and Thomas Ryan, with two counts of murder in the second degree based on his alleged complicity in the April 1979 death of 13-year-old John Pius in Suffolk County. Pius died from having been beaten and kicked and having rocks shoved forcibly into his mouth and down his throat. The defendant was originally convicted after a jury trial in February 1983 of murder in the second degree and manslaughter in the first degree. Following an affirmance in this court *(People v Brensic,* 119 AD2d 281),

the defendant's conviction was vacated and a new trial ordered by the Court of Appeals in June 1987 on the basis that the admission into evidence of the confession of the codefendant Peter Quartararo against him violated New York evidentiary law and denied the defendant his constitutional right to confrontation and due process of law *(People v Brensic,* 70 NY2d 9). Each of the three remaining codefendants were similarly convicted *(People v Quartararo,* 113 AD2d 845, *lv denied* 66 NY2d 921; *People v Ryan,* 121 AD2d 34); however, the convictions of the codefendants Michael Quartararo and Thomas Ryan were subsequently vacated and new trials ordered.[1] Those retrials have not yet commenced.

With respect to the defendant's retrial, the jury selection process commenced on January 20, 1988, and consumed approximately three weeks of voir dire. A jury of 16 Suffolk County residents, including 4 alternates, was impaneled and sworn. Thereafter, by order to show cause dated February 11, 1988, the defendant moved in this court pursuant to CPL 230.20 (2) for a change of venue. The defendant maintains that he cannot receive a fair and impartial trial in Suffolk County as a result of the extensive and pervasive media coverage of the Pius murder throughout the county from the date of the murder to the present time, a period of almost nine years.

The People agree that a change of venue should be granted. In addition to agreeing with the defendant's position regarding the difficulty of providing a fair and impartial trial to the defendant, the People argue further that certain pretrial publicity regarding the Trial Judge's alleged bias against both the Suffolk County Police Department and the District Attorney's office in Suffolk County threatens their ability to obtain a fair trial as well.

---

1. The murder conviction of codefendant Thomas Ryan which was originally affirmed by this court *(People v Ryan,* 121 AD2d 34) was ultimately vacated, upon reargument, following the Court of Appeals decision in *People v Brensic* (70 NY2d 9; *People v Ryan,* 134 AD2d 300). The two remaining codefendants, Peter and Michael Quartararo, were each convicted, following a joint jury trial, of murder in the second degree, and their convictions were affirmed on appeal *(People v Quartararo,* 113 AD2d 845, *lv denied* 66 NY2d 921). The conviction of codefendant Michael Quartararo was recently vacated by the United States District Court for the Eastern District of New York (Korman, J.), by order dated February 9, 1988, which granted a Federal writ of habeas corpus and ordered a new trial based on ineffective assistance of trial counsel *(see, Quartararo v Fogg,* — F Supp — [ED NY, Feb. 9, 1988]).

■ Preliminarily, we note that although ordinarily the defendant's double jeopardy protections under the Federal (US Const 5th Amend) and State (NY Const, art I, § 6) Constitutions would have attached when the jury was impaneled and sworn *(see, Crist v Bretz,* 437 US 28, 35; CPL 40.30 [1] [b]), by making the present application the defendant has effectively waived his right to raise the defense of double jeopardy upon retrial *(see, United States v Scott,* 437 US 82, 83; *People v Catten,* 69 NY2d 547; *People v Ferguson,* 67 NY2d 383, 388). Moreover, during the oral argument on the present application, defense counsel assured this court that he had had extensive discussions with his client with respect to his making the instant application and that the defendant voluntarily and unequivocally consented thereto. Counsel stated further that the defendant was also fully informed of his constitutional protections against double jeopardy and explicitly consented to the waiver of those protections *(see, People v Catten, supra,* at 555).[2]

■ Secondly, although not raised by the prosecution, we conclude that under the facts of this case, the defendant's application has been timely made pursuant to CPL 230.30 (2) and 255.20 (3). The courts have consistently held that except in exceptional circumstances *(see, People v Boudin,* 90 AD2d 253), change of venue motions pursuant to CPL 230.20 (2) made prior to the voir dire are premature *(see, People v Boudin,* 87 AD2d 133; *People v Shedrick,* 83 AD2d 988; *People v Bedell,* 73 AD2d 1045). The record herein demonstrates that after each juror was selected during the voir dire process, the Trial Judge immediately administered the oath to that juror. This process continued until the total of 12 regular jurors and 4 alternate jurors were selected and sworn, thereby signalling the commencement of the trial *(see,* CPL 1.20 [11]). Although the defense counsel informed the Trial Judge, after the tenth juror was selected and sworn, of counsel's intention to make an application to this court for a change of venue, the trial court insisted, and defense counsel agreed, to wait until the completion of voir dire before making the instant application.

---

2. We note that even if counsel had not discussed his intention to make the instant motion with his client, the application would still have constituted a waiver of the defendant's right against double jeopardy since the courts have held that "a defendant need not agree with counsel, or even be in the courtroom when counsel moves for a mistrial, for the motion to be binding on him" *(People v Catten,* 69 NY2d 547, 556; *People v Ferguson,* 67 NY2d 383, 389-390).

Under these circumstances, the defendant has demonstrated that the present application "could not reasonably have been raised" prior to the commencement of the trial (CPL 255.20 [3]).

■ Turning to the merits of the application, the papers submitted to this court by both the defense and the prosecution provide adequate documentation of the vast publicity over a period of nine years dealing with the actual homicide, the subsequent police investigations, the trials and convictions of the four defendants, and the reversals of the convictions and pending retrials of the defendant and his codefendants Ryan and Michael Quartararo. Much of the publicity regarding the Pius homicide was contained in articles in Newsday, a daily publication which represents the primary source of printed news for the residents of Suffolk County. Significantly, many of these articles, including some published shortly before the commencement of the jury selection process herein, relayed the theory of the prosecution's case and made specific reference to the contents of the confession made by the codefendant Peter Quartararo which implicated the defendant and which was determined to have been improperly admitted against the defendant during his first trial *(see, People v Brensic,* 70 NY2d 9, *supra).* In fact, during the initial stages of the jury selection process, an extensive article with front-page coverage appeared in the Sunday edition of Newsday on January 24, 1988. The article reviewed the case, the effect that the victim's death had had on his family, and the pending retrials of the defendant and Ryan. Many prospective jurors indicated that they had seen the front-page photograph in Newsday which depicted the crime scene, and a few prospective jurors acknowledged having read the article at length. The prejudicial effect of this publicity is significant *(see, e.g., Rideau v Louisiana,* 373 US 723 [pretrial television broadcast of the defendant's jailhouse interview by the Sheriff]; *People v Boudin,* 90 AD2d 253, *supra* [among other factors, publicity included detailed testimony of arresting officer given at a pretrial hearing held to test the admissibility of the officer's proposed in-court identification of the defendant]; *People v Pratt,* 27 AD2d 199 [Gabrielli, J.] [newspaper accounts, including quotations of significant portions of the hearing court's *Huntley* decision]; *People v Marturano,* 24 AD2d 733 [release and publication of ruling denying the defendant's motion to suppress his alleged statements and certain evidentiary items obtained during questioning]; *People*

*v Luedecke,* 22 AD2d 636 [the defendant, accompanied by police and prosecutor, was required to reenact the crime for television and reenactment was televised]; *see also, Irvin v Dowd,* 366 US 717).

The defense has also submitted an affidavit setting forth a survey of Suffolk County residents who are eligible for jury service, conducted by a professional polling organization, which documents the widespread knowledge and, in many cases, preconceived opinions of the case. These results can be attributed largely to the homogenity of the community of Suffolk County as well as the fact that the Pius homicide was perhaps one of the most heinous crimes in Suffolk County's history. Moreover, the collective impact of the trials of the four defendants and the recent vacatur of three of the convictions has kept the case in the public eye for an extended period of time *(see, People v Boudin,* 97 AD2d 84 [pretrial publicity included coverage of the codefendant's trial and subsequent sentencing]; *People v Acomb,* 94 AD2d 978 [change of venue granted as a result of the intense localized publicity in a small rural county concerning the homicide, the defendant's arrest, trial, conviction and ultimate reversal of the conviction]; *see also, People v Sawyer,* 94 AD2d 978; *cf., People v Ryan,* 93 AD2d 848).

A review of the voir dire transcript similarly reflects that a high percentage of the pool of prospective jurors in this case possessed some knowledge of the underlying incident. The prospective jurors in the jury pool, numbering approximately 200, were individually questioned by the court and both counsel to determine the extent and source of their knowledge of the case. During the questioning, defense counsel repeatedly raised challenges for cause against prospective jurors arguing that their awareness of the facts of the case, whether expressed or latent, prevented them from being fair and impartial. The majority of these challenges were, however, denied. In fact, 5 of the 12 regular seated jurors, namely, jurors numbers 3, 4, 7, 11 and 12 had indicated during the initial questioning that they were aware to varying degrees, of certain aspects of the case. Jurors numbers 4 and 11 were specifically, but unsuccessfully, challenged for cause by the defense counsel on this basis. Notably, juror number 4 informed the court that he had read the Sunday Newsday article concerning the Pius case and was aware that the defendant had been convicted of murder at his first trial.

It is also significant that when the twelfth juror, who

admitted to possessing prior knowledge of the case, was seated, the defense's peremptory challenges, as well as those of the prosecution, had been exhausted *(cf., People v DiPiazza,* 24 NY2d 342, 348). Moreover, the defense counsel's prior request for an additional 10 peremptory challenges had been denied by the Trial Judge.

While each of these five knowledgeable jurors had expressed an ability to render an impartial verdict despite their prior knowledge, it has been recognized that "[n]o matter how solemnly given, a juror's statement that he has not been influenced by prejudicial publicity and is capable of affording the defendant a fair trial is not necessarily dispositive (see, e.g., *Marshall v United States,* 360 US 310, 312; cf. *Irwin v Dowd,* 366 US 717, 722-723)" *(People v Boudin,* 90 AD2d 253, 256, *supra).*

A compelling factor in our determination to direct the change of venue herein, is the fact that the People have unequivocally and candidly stated that based upon the results of the jury selection process as well as the documentation submitted by the defense, a change of venue is necessary to protect the defendant's right to a fair trial. The People have thus acknowledged that the recurring and extensive nature of the media coverage of this particular case, coupled with the large number of jurors, five of whom were ultimately seated, who possess actual knowledge of the case, has prejudiced the defendant's ability to obtain a fair and impartial trial.

An additional basis for the prosecution's position on the defendant's application stems from the rather troublesome fact that during the jury selection process herein, an extensive three-page article appeared in Newsday on January 26, 1988, which related an interview with the Trial Judge presiding over this case, who had presided at the first trial as well. The lengthy article purported to detail a change in the Trial Judge's jurisprudential philosophy in the last few years which it attributed to the Judge's belief that the testimony of Suffolk County police officers in previous homicide cases was perjured with the apparent knowledge of the District Attorney's office. Although the Trial Judge specifically refused to comment on the trial *sub judice,* the article contained numerous references to the case. For example, a headline appeared on the front page of part II of Newsday beneath a full-page photograph of the Trial Judge referring to him as "[T]he Suffolk County judge who charged police and prosecutors with questionable

tactics now has to give his own judgment a second look as he retries the Pius murder case".

The impact which this article had on the voir dire is evidenced by the fact that the second panel of prospective jurors was called into the courtroom on the same day the article regarding the Trial Judge was published. These jurors had not been previously instructed to not read articles concerning this case. In fact, during the questioning of these prospective jurors, some jurors indicated that they had already read all or part of the article or had seen the article or had seen the Judge's photograph in the newspaper. More significantly, the twelfth juror, who was seated after all of the peremptory challenges for both sides were exhausted, specifically stated that he had seen the Trial Judge's photograph although he did not read the article.

While we in no way question Newsday's right to publish articles regarding the Pius case or the Trial Judge, "and we yield to none in our regard and concern for the unfettered rights of the press under our First Amendment[; n]evertheless, it is well settled that '[n]ewspapers, in the enjoyment of their constitutional rights, may not deprive accused persons [or the People] of their right to a fair trial' *(Shepherd v Florida,* 341 US 50, 53 [concurring opn of JACKSON, J., in which FRANK-FURTER, J., joined]). Where that right is seriously threatened by publicity, courts are under a constitutional obligation to take 'strong measures to ensure that the balance is never weighed against the accused [or the People]' *(Sheppard v Maxwell,* 384 US 333, 362)" *(People v Boudin,* 90 AD2d 253, 259, *supra).*

Parenthetically, we note further that the difficulty in providing a fair and impartial trial of this case in Suffolk County has been further exacerbated by the Trial Judge's instruction which he gave to the jury after he was informed of the pending application. The court, over defense counsel's strenuous objection, stated, in pertinent part, as follows: "There's been—something has come up which is going to necessitate a delay of this trial at this time. Okay? There's been an application made for a Change of Venue * * * to move the trial to another County. That application was joined in by the People and is being considered in the Appellate Division at the present time". Although the court thereupon informed the jury not to speculate as to why the application had been made, the aforementioned instruction improperly conveyed to

the jurors the information that neither the defense nor the prosecution wanted to try this case in Suffolk County.

We conclude that, in the interest of justice, the defendant's motion for a change of venue should be granted. The totality of the circumstances in this case demonstrates the existence of "reasonable cause to believe that a fair and impartial trial cannot be had" (CPL 230.20 [2]) in the present venue. Accordingly, the indictment and action should be removed from the County Court, Suffolk County, to the Supreme Court, Kings County.

MOLLEN, P. J., MANGANO, BROWN and KOOPER, JJ., concur.

Ordered that the motion is granted and the indictment and action is removed from the County Court, Suffolk County, to the Supreme Court, Kings County.